[Nos. 39475, 39481. En Banc. October 29, 1968]

THE STATE OF WASHINGTON, *Respondent*, v. LEODIS SMITH
*et al., Appellants.**

*Reported in 446 P.2d 571.

*Joel A. C. Rindal, Frank L. Sullivan, Donald J. Horowitz,* and *Farris, Bangs & Horowitz,* for appellants (appointed counsel for appeal).

*Charles O. Carroll, H. John Aitken, Steve Paul Moen,* and *Larry L. Barokas,* for respondent.

ROSELLINI, J.—The defendants appeal from judgments and sentences entered on verdicts of guilty of two counts of murder in the first degree, four counts of robbery, and one count of assault in the first degree. The special verdicts of the jury imposed the death penalty upon each of them for the second murder count, but only a life sentence for the first. The court ordered that the death penalty should take precedence over the penalties for the other crimes.

The first count concerned the murder of Edwin A. Hutton, which occurred on December 4, 1965. Mr. Hutton was

found, bleeding from gunshot wounds in the neck and shoulder and lying in the gutter beside his car, which was parked at the corner of 22nd Avenue and East Terrace in Seattle, a few minutes after he had left the Drum Room, a bar located at Pike Street and 14th Avenue. A witness had observed the defendants getting in his car at that time. A fingerprint of the defendant Smith was found in the car. Mr. Hutton told the police officer, who came to the scene within a few minutes after the shooting, that he had been shot by two Negroes to whom he had given a ride and who had tried to rob him. There was evidence that Mr. Hutton had cashed a check for $30 just before leaving the Drum Room. His wallet was found in the street beside his car, and there was no money on his person or in his car.

Count 5 concerned the robbery of Earl Ohlinger, which occurred on May 20, 1966. Mr. Ohlinger testified that the defendants followed him to his apartment at 420 Terry Avenue in Seattle, where they beat him and robbed him. His cigarette lighter and watch were found in the possession of defendant Riggins when he was arrested.

Two days later, on May 22, 1966, shortly after 2 a.m., Dennis Hagen and his 10-year-old son Phillip returned to their home at 729-17th Avenue in Seattle, having been to a late movie. The defendants were in the house. They inflicted beatings upon both the father and the boy, and took what money they could find. They also strangled the boy twice, each time until he lost consciousness. The defendant Smith's fingerprint was found on a broken pane of glass which was lying on the floor beside the back door. This incident formed the bases for count 6, robbery of Dennis Hagen, and count 7, assault in the first degree upon Phillip Hagen.

The evidence produced with reference to count 2, the murder of Reva Krimsky, and count 4, robbery of her husband, Simon Krimsky, tended to show that the defendants entered the Krimsky apartment at 705-24th Avenue, Seattle, on the night of May 25, 1966. They strangled Mrs. Krimsky with her husband's necktie and forced Mr. Krim-

sky, who was 84 years of age to lie on the floor beside her while she died. Meanwhile, they ransacked the apartment and took the small amount of cash which they were able to find. They also took wrist watches belonging to the Krimskys.

The surviving victims identified the defendants in police lineups and in photographs.

Further facts, as well as the proceedings in the case, will be set forth here with the assignments of error to which they relate.

The defendants were first charged in justice court, where they demanded a preliminary hearing. Before the day set for the hearing, the prosecutor filed charges in superior court, and the justice court judge dismissed the charges pending there. The defendants contend that they were thereby denied a right which they claim to a preliminary hearing. They concede that this court held recently in *State v. Kanistanaux*, 68 Wn.2d 652, 414 P.2d 784 (1966), that a defendant does not have a right to a preliminary hearing in order to gain access to the evidence which the prosecutor has against him. They cite no authority which was not considered in that case and no authority supporting their contention. For the reasons stated in that opinion, this theory is not well founded.

Error is assigned to the denial of the defendants' motion to produce documentary evidence. The court allowed them the current addresses of the state's witnesses, copies of photographs, sketches, maps, or drawings which the state expected to offer, and copies of autopsy reports.

The defendants say that the court abused its discretion in not allowing them to see the statements which the prosecutor obtained from witnesses, because they were young and unable to assist in the preparation of their defense. However, they do not say in what respect their defense would have been aided by access to these statements, except that it would have made the interviewing of witnesses easier. They do not suggest that they were denied access to any information which would have helped them to contradict or

discredit witnesses, or prove alibi, or prove any other defense.

In short, there is not the slightest showing of prejudice. Nor is there any contention that the state's witnesses refused to talk with defense counsel, or that defense counsel could have impeached any testimony of theirs if counsel had been allowed to examine the statements which the witnesses gave to the prosecutor before the trial. They cite no authority supporting the contention that they are entitled to the prosecutor's "work product," and we must assume that none exists. As the defendants concede, the trial court's ruling on a motion to produce will not be reversed in the absence of a showing of an abuse of discretion. *State v. Gilman,* 63 Wn.2d 7, 385 P.2d 369 (1963). The defendants' bare allegation of prejudice does not amount to such a showing.

The defendant Smith moved the court to suppress statements taken from him before he had been advised of his right to counsel. The prosecutor informed the court that he did not intend to use these statements in his case in chief, but might use them for impeachment if Smith took the stand. He cited *State v. McClung,* 66 Wn.2d 654, 404 P.2d 460 (1965), holding that involuntary statements can be used for impeachment purposes where the defendant denies he made them. The trial court refused to suppress the statements, advising counsel that, if the statements were offered, the court would then rule on the question. Smith did take the stand and testify, but did not testify about the alleged crimes. The prosecutor did not offer the statements in evidence. Nevertheless, Smith argues that his testimony was effectively restricted by the fear that they would be used for impeachment purposes if he testified concerning the circumstances of the crimes. This in itself is no objection, if the statements could lawfully have been used for that purpose (as the defendant concedes we have held that they could); and if they could not have been properly used for impeachment, an erroneous ruling of the trial court when they were offered for that purpose would

have been ground for reversal. But since the trial court was never confronted with the necessity of ruling on the question, there was no action of the trial court upon which error can now be predicated.

The defendants urge that the trial court erred in overruling their challenge to the jury panel. This allegation is based upon two claims, the first of which is that there was a failure to comply with the statutory guidelines for drawing the jury panel from the community.

RCW 2.36.060 provides that the superior court judges are to have a jury list drawn during the month of July each year, which list shall be used as the basis for the panel to serve until August of the following year. The defendants claim that the drawing of the panel for the instant case on June 27, 1966, 4 days before the month of July, renders that panel a nullity.

The trial court found that there was no showing that there was any difference in the voter registration books on June 27 and July 1.

Unless there has been a material departure from the statute, prejudice will not be presumed. *State v. Finlayson,* 69 Wn.2d 155, 417 P.2d 624 (1966). Certainly, the drawing of the lists 4 days before the designated month, when the registration books were substantially the same, was not a material departure from the statutory direction. The defendants do not suggest in what way they were prejudiced by this irregularity. The purpose of the statute is to provide a fair and impartial jury. *State v. Finlayson, supra,* and cases cited therein. If the irregularity here resulted in a biased or unfair jury, that fact is not pointed out in the brief. We find no merit in this contention.

The other ground upon which the panel was challenged was that it did not represent a cross-section of the community, inasmuch as certain classes of persons were, by the provisions of RCW 2.36.080, exempted from service. Under this statute officers of the United States and of the state, attorneys at law, school teachers, practicing physicians, licensed embalmers, active members of the fire and police

departments of any municipality, women and all persons over 60 years of age are exempt from jury service.

■ The defendants cite *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 90 L. Ed. 1181, 66 Sup. Ct. 984 (1946), holding that a particular economic group may not be systematically *excluded* from jury service, as that would tend to establish the jury as the instrument of the economically and socially privileged. Of course, the exemptions provided in RCW 2.36.080 are not exclusions. Any member of the classes listed therein must claim his exemption in order to be relieved of jury duty, and if he does not wish to do so, he is free to serve. In this case, four women served, and at least one person who was over 60 years of age. The defendants have brought to our attention no authority holding that exemptions such as those listed in our statute result in a jury which does not represent a cross-section of the community. On the other hand, the United States Supreme Court has approved such statutes in *Rawlins v. Georgia*, 201 U.S. 638, 50 L. Ed. 899, 26 Sup. Ct. 560 (1906), where they are based on the bona fide ground that the regular work of these persons should not be interrupted for the good of the community. No case to the contrary has been cited, and our research has revealed none. This assignment of error is likewise without merit.

Error is assigned to the denial of the defendants' motion for a continuance, made on the ground that publicity concerning a murder by two young men on the eve of the trial was bound to create passion and prejudice in the minds of the jurors. The defendants questioned the prospective jurors about this publicity. Most of them had read the stories only cursorily, if at all. And, in fact, the defendants can call attention to only one member of the panel who stated that publicity concerning other murders had created unusual anxiety in his home. That juror said that "ever since the killing up on Queen Anne and the strangulation at Kent and the closeness of the strangulation on Beverley Park, my wife is scared to stay alone."

It does not appear that any of the murders which this venireman referred to was the one on which the defendants

based their motion. As the trial court observed, murders are not committed on schedule; and if the court were to grant a continuance every time one occurred, the case might never be tried.

The defendants cite no authority for the proposition that publicity about matters which are not at issue in the trial, or about persons who are not on trial, is grounds for a continuance. But assuming that a situation might arise in which such publicity was in fact prejudicial to the defendant, it would nevertheless need to be demonstrated that such prejudice had indeed been engendered. *State v. Collins*, 50 Wn.2d 740, 314 P.2d 660 (1957). The defendants concede that the granting of a motion for continuance on the ground of local passion and prejudice is within the sound discretion of the trial court. They have not shown that that discretion was abused in this instance.[1]

Error is assigned to the overruling of the defendants' demurrer and denial of their motion to strike, which were based on the contention that there was an improper joinder of counts. They say that the crimes charged were not of the same class and were not closely connected in time, and further that the witnesses to the matters contained in the various counts were not the same.

The joinder statute is RCW 10.37.060, which provides:

When there are several charges against any person, or persons, for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments or informations the whole may be joined in one indictment, or information, in separate counts; and, if two or more indictments are found, or two or more informations filed, in such cases, the court may order such indictments or informations to be consolidated.

---

[1] RCW 10.49.060 provides that if two defendants are on trial together, they have 12 peremptory challenges. The court, out of extraordinary caution and to assure a fair trial, granted each defendant 12 peremptory challenges.

The defendants concede that this court has held, in *State v. Winters*, 39 Wn.2d 545, 236 P.2d 1038 (1951) and *State v. Williams*, 49 Wn.2d 354, 301 P.2d 769 (1956), that counts charging crimes of the same class may be joined, and that counts charging crimes committed as part of the same transactions may be joined with them. In the first of these cases cited, it was held proper to join five counts of rape and attempted rape with two counts of robbery, the robberies having been committed in connection with two of the alleged rapes or attempted rapes.

■ While the opinion does not disclose whether the alleged crimes were closely connected *in point of time*, the briefs on file in that case show that the first of the alleged incidents occurred September 16, 1948, and the last occurred on February 3, 1950. In other words, the alleged acts occurred over a period of almost 1½ years. In the case before us, two of the alleged crimes were committed on December 4, 1965; the remaining acts were done less than 6 months later, in the month of May 1966.

Thus, neither the fact that the crimes charged did not occur close together in time or that the witnesses were different prevented the joinder.

*State v. Williams, supra,* also involved counts of robbery and rape, the robbery in one count being connected with the rape in another count, but unconnected with the rape charged in the third count. The joinder was held proper.

The defendants rely, however, upon an earlier case, *State v. McCourt*, 157 Wash. 499, 289 Pac. 41 (1930), holding that murder and robbery are not of the same class and that it was improper to join a murder charge with charges of robbery, even though the murder was connected with one of the robberies. That case is out of harmony with our later cases, particularly those cited above, and it is hereby overruled.

■ As we said in *State v. Long*, 65 Wn.2d 303, 396 P.2d 990 (1964), quoting from *State v. Brunn*, 145 Wash. 435, 260 Pac. 990 (1927), the joinder of counts should never be utilized in such a way as to unduly embarrass or prejudice

one charged with a crime, or deny him a substantial right.

The defendants quote the following from *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964):

> The justification for a liberal rule on joinder of offenses appears to be the economy of a single trial. The argument against joinder is that the defendant may be prejudiced for one or more of the following reasons: (1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one. Thus, in any given case the court must weigh prejudice to the defendant caused by the joinder against the obviously important considerations of economy and expedition in judicial administration.

The defendants have been unable to show that any of these prejudicial effects was achieved in their case. We have reviewed the record and find that the state's evidence was not "weak" on any count, so there was no necessity for the jury to base its finding of guilt on any one count on the strength of the evidence on another count.

The defendant Riggins relied on only one defense, that of alibi. The defendant Smith simply rested on his denial. There was no confusion of defenses, and the defendants freely concede that the evidence was sufficient on each count without the necessity of bolstering the state's case with evidence of the other crimes. The trial court did instruct the jury, without objection on the part of the defendants, that evidence of other crimes could be considered on any one count only as it bore on the elements of motive, intent, identity, or common scheme or plan. The prosecutor cites numerous cases sustaining the propriety of the evidence for such purposes, and the defendants cite none to the contrary.

It may be true that, as the defendants contend, the multiplicity of crimes charged, and particularly the heinousness of the attack on the small boy, were likely to lead the jury to impose the death penalty for one or both of the murders. However, since the evidence of the other crimes would have concededly been admissible in separate trials, the defendants were not unduly prejudiced by the joinder.

The defendant Riggins contends that error occurred when he was denied his motion for a separate trial and when he was denied an opportunity to question his codefendant extensively respecting the alleged incidents material to the trial. He concedes that he must show an abuse of discretion in order to obtain a reversal for denial of his motion for a separate trial. In his search for a basis for this contention, he has discovered only one fact in the record which could conceivably prejudice him. This was the fact that his codefendant did not testify about the circumstances of the crimes and did not deny on the witness stand that he had been implicated, whereas the defendant Riggins did utter such a denial. He maintains that this fact rendered their defenses incompatible.

No authority is cited in support of this contention, and we must assume that none exists. *Seattle v. Muldrew,* 69 Wn.2d 877, 420 P.2d 702 (1966). The trial court instructed the jury that each defendant had entered a plea of not guilty and that the burden was upon the state to prove that each of them committed the crimes charged, beyond a. reasonable doubt. It also instructed the jury that no inference of guilt or innocence was to be drawn by the jury from the fact that a defendant failed or refused to take the stand as a witness to testify to matters concerning the crimes with which he was charged.

Under these instructions, the defendant Smith's failure to deny on the witness stand that he was implicated in the crimes charged can hardly be construed as "evidence" implicating the defendant Riggins.

Riggins cites the case of *Day v. State,* 196 Md. 384, 76 A.2d 729 (1950), wherein it was held error to deny a mo-

tion for separate trials, where the confession of each codefendant blamed the other for the actual killing. There were no confessions introduced in this case, and no evidence by either defendant implicating the other or placing the primary blame on him. Another case cited is *State v. Blanchard*, 44 N.J. 195, 207 A.2d 681 (1965). In that case, evidence admissible against one defendant was inadmissible against another, and it was held error to deny a motion for separate trials. The defendant Riggins is unable to point to any evidence introduced in his trial which was not admissible against both defendants.

In arguing his contention that he should have been allowed to call the defendant Smith to the witness stand and question him about the circumstances of the crimes, the defendant Riggins declares that, had the two been tried separately, he would have been permitted to do this, even though he knew that Smith would claim the privilege against self-incrimination guaranteed by the fifth amendment to the United States Constitution, as well as article 1, section 9, of the Washington State Constitution.

We may concede that in a separate trial, he would have been allowed to do this, and the defendant Smith would have had to claim his privilege on the witness stand. But this does not mean that he was denied a valuable right in the trial as it was conducted. The claiming of the privilege is not evidence, and the jury is not allowed to draw inferences from it. The defendant Riggins has cited no authority to support his contention that his inability to draw from the defendant a claim of the privilege, in the presence of the jury, deprived him of evidence in his favor.

This defendant rests his claim on the sixth amendment to the United States Constitution and amendment 10 to the Washington Constitution. These provisions do give a defendant the right to confront the witnesses against him (it is not suggested that Smith was a witness against Riggins) and to compel the attendance of witnesses in his favor. The defendant Riggins does not claim that Smith would have been able to give any evidence in his favor, or had any

information favorable to him. There was no offer of proof in this regard in the trial court, and the only "evidence" which he now suggests would have been supplied by Smith was the claiming of the privilege against self-incrimination. Ingenious though the defendant's theory is, we find no support for it in the law.

Nearly all cases dealing with this question involve the improper acts of prosecuting attorneys, rather than code-fendants. It is forbidden for a prosecutor to call a witness, knowing that the witness will invoke the privilege, for the purpose of having the jury see the witness exercise his constitutional right. *DeGesualdo v. People,* 147 Colo. 426, 364 P.2d 374, 86 A.L.R.2d 1435 (1961); *State v. Mitchell,* 268 Minn. 513, 130 N.W.2d 128 (1964), *cert. denied* 380 U.S. 984, 14 L. Ed. 2d 276, 85 Sup. Ct. 1351 (1965); *United States v. Tucker,* 267 F.2d 212 (3d Cir. 1959); *United States v. Maloney,* 262 F.2d 535 (2d Cir. 1959). It is also error for the prosecutor to call a codefendant, knowing that he will invoke the privilege. *See State v. Tanner,* 54 Wn.2d 535, 341 P.2d 869 (1959). There is no reason for distinguishing these cases on the basis that the party calling the witness was the government. The fundamental point is that the exercise of the privilege is not evidence to be used in the case *by any party.* As the court said in the *Tucker* case, *supra,* at 215:

[A]n interrogating official himself gravely abuses the privilege against self incrimination when, believing a truthful answer will incriminate a witness, he neverthe-less insists on asking the incriminating question with a view to eliciting a claim of privilege and thereby creat-ing prejudice against the witness or some other party concerned.

*State v. Medley,* 178 N.C. 710, 100 S.E. 591 (1919), in-volved a robbery prosecution of a man and woman. The male defendant attempted to call the woman as his witness in an attempt to show that he had not been with her for 2 months, including the night of the robbery, and that she had come into possession of the victim's watch during acts of prostitution. The female defendant advised the court that she wished to invoke her privilege against self-incrimi-

nation. The trial court's refusal to make her take the witness stand and exercise her right in front of the jury was upheld on appeal.

If the claiming of the privilege is not evidence which the prosecutor can use, there is no reason why it should be deemed to acquire probative value simply because a codefendant rather than the state seeks to utilize it.

■ The trial court correctly refused to permit the defendant Riggins to call the defendant Smith to the stand for the purpose of requiring him to claim the privilege against self-incrimination. It was also correct in refusing to hold that this theory of the defendant offered a valid basis for granting his motion for a separate trial. Where no showing is made to the trial court that the defendants will in fact be prejudiced by being tried together, there is no abuse of discretion in denying their motion for separate trials.

The defendant Riggins made another abortive effort to utilize a claim of the privilege against self-incrimination as positive evidence. At one point his counsel called his brother, John Riggins, to the stand and questioned him about his association with the defendant Smith. At the time of the trial, John Riggins was a prisoner in the King County jail, having been charged with robbery and assault.

This witness testified in corroboration of the defendant Riggins' claim that he had purchased Earl Ohlinger's watch and lighter from a third party. He then acknowledged that he knew and had gone around with the defendant Smith. When asked if he had gone around with him late at night, he invoked the privilege. The jury was immediately excused at the request of the state. The trial court later held that John Riggins had waived the privilege against self-incrimination and found him in contempt for refusing to answer questions of the defendant Riggins concerning whether he was with the defendant Smith on the nights of the various crimes charged in this case.

The trial court was of the opinion that the entire tactic of putting John Riggins on the stand was deliberate and for

improper motives. Trial counsel for the defendant Riggins indicated that John Riggins had been called in order to establish the possibility that *he* was the shorter of the two men seen running from the scene of the Hutton robbery and murder. But, as a matter of fact, John Riggins was incarcerated in the Washington State Reformatory at the time of the Hutton crime.

The defendant Riggins requested that he be permitted to force John Riggins to invoke the privilege against self-incrimination in the presence of the jury.

Error is assigned to the denial of this request. As we have said, the invoking of the privilege is not evidence. As in the case of the defendant Riggins' attempt to use the non-testimony of the defendant Smith, he made no offer of proof and makes no contention here that Riggins would have given favorable testimony had he testified. We think the trial court was justified in its conclusion that this attempt on the part of the defendant Riggins was simply a tactic designed to mislead the jury. It did not err in thwarting it. *See State v. Tanner, supra.*

The defendant Smith, taking the other side of the coin, argues that the trial court erred in denying his motion for a mistrial based on his contention that the jury was bound to have inferred from the testimony of John Riggins that he and Smith committed the crimes charged. The complete answer to this, of course, is that the jury obviously did not draw this inference, else it would have exonerated the defendant David Washington Riggins. John Riggins was not asked whether he was out with Smith on the nights of the crimes. The trial court admonished the jury in clear and unmistakable terms to disregard the incident entirely. If the jury drew any inferences, it is reasonable to suppose that it inferred that the defendant Riggins was attempting to implicate the defendant Smith while exonerating himself, and that this attempt did not have the sanction of the court. If the jury did not believe the numerous state's witnesses who testified that Smith was one of those who committed the crimes charged, it is inconceivable that it would

rest its verdicts on an inference gleaned from a refusal to testify on the part of a witness who was not even shown to have been acquainted with any of the facts. The trial court correctly denied the motion.

The defendant Riggins also contends that the court erred in denying him the right to argue inferences from Smith's and John Riggins' exercise of the privilege. He cites no authorities in support of the proposition that he had such a right, and we will assume that none exist. Such a right would be inconsistent with the rule, which we have cited, that the exercise of the privilege carries with it no legitimate inferences.

Error is assigned to the admission of testimony concerning statements made by the victim, Edwin A. Hutton, as he lay in the gutter beside his car a few minutes after he was shot. The statements were made in response to questions of the officer who came to investigate. The statements were consistent with the testimony of the witness Klepeck, who saw Hutton get in his car with two Negroes, whom he later identified as Smith and Riggins. The gist of the victim's statement was that he had been shot by two Negroes who had asked for a ride home on 14th Avenue, and who had tried to rob him. It is the position of the defendants that these statements were hearsay and were not a part of the res gestae.

██ Defendants correctly cite *Beck v. Dye*, 200 Wash. 1, 9, 92 P.2d 1113, 127 A.L.R. 1022 (1939), as laying down the general criteria for the res gestae exception to the hearsay rule. In that case, this court said:

> [S]tatement or declaration concerning which testimony is offered must, in order to make such evidence admissible, possess at least the following essential elements: (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction

or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

The statements of Hutton were made by the victim of the shooting (the main event) and described what had occurred; they were made to the first person who approached and questioned the victim; they were statements of fact and not of opinion, and they were made within 20 minutes after the shooting while the victim was lying in the gutter bleeding. The fact that they were made in answer to questions does not in itself mean that they were not spontaneous.

In *State v. Kwan*, 174 Wash. 528, 535, 25 P.2d 104 (1933), also a murder prosecution, this court described the following situation:

It is next contended that it was error to permit the police officer to testify, when he arrived, that Bow said that China boys had shot him, for the reason, as it is claimed, that this statement was not a part of the *res gestae*. The officer giving the testimony arrived at the scene of the homicide a few minutes after the shooting. Bow at this time was lying on the sidewalk, leaning against the steps leading up to a neighbor's residence.

We said:

The fact that the answer was given in response to a direct question does not destroy its spontaneity. Statements, though in answer to a question, are nevertheless spontaneous and instinctive where the surrounding facts and circumstances negative the thought that they might have been made with design or premeditation. *Lucchesi v. Reynolds*, 125 Wash. 352, 216 Pac. 12; *State v. Labbee*, 134 Wash. 55, 234 Pac. 1049. The evidence in this case shows that the statement was spontaneous and instinctive, and was not made with design or premeditation.

We think it clear that the circumstances involved here negative any thought that Hutton's statements were made with design or premeditation or that they did not accurately portray his knowledge of what had happened to him. The defendants say that he had to be prodded and "wanted to talk about other aspects of his situation." The "other aspects" were his pain and his desire to pursue and catch his assailants. There is nothing in the circumstances to suggest any motive to falsify the facts. We are of the opinion that the statements carried with them that degree of credibility which made them admissible under the so-called res gestae exception to the hearsay rule.

The defendants next urge that the trial court erred in refusing to grant a mistrial on the defendant Riggins' motion, the motion having been based on a claim that incurable prejudice was engendered by a witness' use of the term "mug shot." The defendants say that the use of this term implanted in the minds of the jurors the idea that they both had criminal records. The incident occurred in the following manner.

Counsel for the defendant Smith questioned the witness Klepeck as follows:

Q. (By Mr. Sullivan) You have identified the two defendants here, Mr. Klepeck, as the two men that you saw on the street that night? A. (Witness nods affirmatively.) Q. Between that night and today in court how many identifications have you made of these two or anyone else as being the two on the street? A. I have seen some pictures from the Seattle Police Department, mug shots. Q. When did you see these pictures? A. I believe it was in June.

No objection was made at the time, and it was not until later that counsel for the defendant Riggins moved for a mistrial. The trial court held that the response had been invited, but instructed the prosecutor to admonish his witnesses not to use such terms on the witness stand.

In *State v. Nettleton,* 65 Wn.2d 878, 400 P.2d 301 (1965), we said: "The test is: Did the inadvertent remark, when viewed against the backdrop of all the evidence, so

taint the entire proceedings that the accused did not have a fair trial?"

In *State v. Allen*, 72 Wn.2d 38, 431 P.2d 590 (1967), we held that the fact that a detective, testifying on behalf of the state, used the term "mug shot" three times, did not so taint the proceedings as to deprive the defendant of a fair trial. At the same time we suggested that prosecutors should instruct their witnesses not to use such terms.

Not only did this remark make such a slight impression on counsel for both defendants that no objection was voiced at the time, and no request was made for an instruction to disregard it, but counsel for defendant Riggins himself used the term later in the trial in addressing the jury.

Alluding to the fact that the witness Klepeck, who identified the defendants as the persons who got in the victim Hutton's automobile on December 4, 1965, had not been shown pictures of the defendants until the following May, he said:

What happened to all these mug shots or the different types of pictures that he should have looked at in December of last year? No testimony. Lack of evidence. It is that simple. This can certainly go to the credibility of that man.

Having used the expression in reference to his own picture voluntarily, this defendant, who was the one who moved for a mistrial because the witness used it, cannot be heard to say that the use of it by the witness was prejudicial.

There was extensive testimony about identifications made by different witnesses who picked out pictures of the defendants from among others shown them by the police. Much of this testimony was elicited by the defendants on cross-examination of the witnesses. The fact that on one occasion a witness referred to these as "mug shots" may conceivably have caused the jury to infer that the pictures represented persons with prior criminal records, rather than persons who had merely been arrested; but this could not have harmed the defendant Riggins, since he took the stand himself and described his criminal record.

As for the defendant Smith, there was testimony that the pictures which were shown the witnesses were pictures of students in a high school annual, among whom the witnesses identified the defendant Smith. A reasonable inference from this was that Smith did not have a criminal record and the police did not have a "mug shot" of him prior to this arrest. But more significant than this is the fact that Smith took the stand and testified that he had never been convicted of a crime. This testimony was not contradicted by the prosecution.

In view of these facts, we think it cannot be seriously contended that the one reference to the pictures furnished by the police as "mug shots" affected the verdict.

The defendants claim that they are entitled to a new trial because they did not have their counsel present at police lineups. They cite *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 Sup. Ct. 1926 (1967), as authority for the proposition that they were denied their right to counsel on May 27, 1966. The *Wade* case was decided on June 12, 1967, along with *Gilbert v. California*, 388 U.S. 263, 18 L. Ed. 2d 1178, 87 Sup. Ct. 1951 (1967). The *Wade* and *Gilbert* cases established a new rule to the effect that the prosecution may not use evidence of lineup identification unless the accused was afforded the opportunity to have counsel present at the lineup.

On the same day that the United States Supreme Court decided the *Wade* and *Gilbert* cases, *supra,* that court considered the question of retroactivity of the new rule. In *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 Sup. Ct. 1967 (1967), the court noted the fact that it was imposing a new rule and that, prior to that day, courts had held that there was no right to counsel at a lineup. The only case which had recognized that right was the Fifth Circuit Court of Appeals decision in the *Wade* case, which had been rendered on May 11, 1966. *Wade v. United States,* 358 F.2d 557 (5th Cir. 1966). Having carefully considered the question of retroactivity, the court ruled that the *Wade* and *Gilbert* rule would apply only to lineups held after June 12,

1967. This court has recognized that the *Wade* and *Gilbert* rule is not retroactive. *State v. Brewer,* 73 Wn.2d 58, 436 P.2d 473 (1968).

The defendants have cited no occurrence at the lineup which would afford an independent ground for holding that it was conducted unfairly. Since the rule laid down in those cases was not based on a conclusion that identification at a police lineup is inevitably suspect if conducted without the presence of counsel, but was evidently intended to be a new rule laid down to further insure the defendant's recently recognized right to counsel at "every critical stage," and since the United States Supreme Court impliedly recognized that a fair trial could be had even though counsel had not been present at such a lineup, we decline to apply this new rule retroactively in this case. If there were any showing of prejudice to the defendants by reason of the absence of counsel in this instance, a different question would be presented.

The next contention of the defendants is that they were prejudiced in their defense by the fact that the prosecution did not furnish them copies of "blow-up" photographs of fingerprints of the defendant Smith. They do not claim that they were entitled to copies of the original fingerprint impressions taken by the prosecution, but only to the enlarged pictures of them.

In its pretrial order on the defendants' motion to produce, the trial court ordered the prosecution to allow the defendants to examine all photographs which it expected to use at the trial. When he offered the enlargements for illustrative purposes and was met with the defendants' objection, the prosecutor said that he had not realized these were within the purview of the court's order. The defendants had not made a specific request for access to fingerprint evidence.

While remarking that defense counsel, some of whom had recently served as assistant prosecutors themselves, should have been aware that fingerprint evidence would be introduced and should have been prepared to meet it, the

court nevertheless volunteered its assistance to defense counsel in obtaining a fingerprint expert to examine the prints. After the expert had made his examination and comparisons, the defendants declined to offer his testimony.

Since the defendants even now do not suggest that they could have found an expert who would have disagreed with the prosecutor's expert (they simply say that they *might* have found one had they been given the photographs before the trial), we must assume that they have either endeavored to find one and have failed or that they have had too little faith in the success of such an endeavor to embark upon it. Whatever the reason, in the absence of such a showing this assignment of error cannot be held to have merit.

The defendant Smith assigns error to the court's refusal to admit in evidence his exhibit No. 82. This exhibit was a set of lenses which would allegedly enable a person with normal vision to see with the defendant's uncorrected vision. The defendant felt that this evidence was important in proving that the witnesses who testified that he was not wearing glasses at the scenes of the Hutton, Ohlinger, and Krimsky crimes were mistaken in their identification of him. The trial court refused to allow the exhibit because the doctor admitted that different jurors would see differently through the lenses, unless they each had exactly the same vision.

The admissibility of experiments, illustrations and other demonstrative evidence rests within the sound discretion of the trial court, and such evidence should be based upon conditions and circumstances substantially like the facts which are sought to be proved. *Seattle-First Nat'l Bank v. Rankin*, 59 Wn.2d 288, 367 P.2d 835 (1962); *Sewell v. MacRae*, 52 Wn.2d 103, 323 P.2d 236 (1958); *Bremerton v. Smith*, 31 Wn.2d 788, 199 P.2d 95 (1948).

Since the validity of this demonstration depended upon an unknown factor—the vision of each of the 12 jurors—the trial court did not abuse its discretion in excluding it. Furthermore, the point which the defendant sought to have made was amply presented by the doctor's testimony.

It is next urged on behalf of the defendant Riggins that the court erred in refusing to dismiss the charges against him on counts 1 and 3 dealing with the Hutton murder and robbery. There was evidence of an eyewitness identifying the defendant Riggins as one of the two men who entered Hutton's car a few minutes before he was slain. A person of Riggins' general description, with a person of Smith's general description was seen running from the scene of the crime in the direction of Riggins' house. The victim said that he had been shot by two Negro men he had picked up on 14th Avenue. Smith's fingerprint was found on a pair of spectacles in Hutton's car. There was testimony that a $30 check had been cashed for Hutton a few minutes before he left the Drum Room. His wallet was found on the street beside his car and there was no money in it or on his person. Hutton said his assailants' demanded his money before they shot him. This evidence was sufficient to sustain the verdict on these counts.

Both defendants contend that the charges should have been dismissed on the defendant Smith's motion made at the close of the state's case challenging the sufficiency of the evidence. Since both defendants elected to put on substantive evidence in their own behalf, that challenge was waived. *State v. Mudge,* 69 Wn.2d 861, 420 P.2d 863 (1966). Aside from this, there was ample evidence to sustain the verdict on every count.

The defendant Riggins assigns error to the ruling of the court admitting in evidence a suit coat belonging to him. The witness Klepeck said that the coat looked like the jacket the shorter man was wearing on the night of the Hutton murder. Riggins maintains this was inadequate identification to give the coat any probative value, and that its admission was prejudicial to him.

The coat was relevant, material, and competent evidence, supporting the identification of the appellant Riggins. The fact that witnesses did not state "this is positively the coat" does not diminish its admissibility as evidence. Such matters go to the weight which the jury may choose

to give the evidence. In *State v. Spadoni*, 137 Wash. 684, 691, 243 Pac. 854 (1926), this court said:

Any evidence tending to identify the accused as the guilty person is relevant and competent. It need not be in itself sufficient to support a conviction in order to be admissible; it is enough, if it has a tendency to that effect. Nor need the evidence be so far positive as to leave nothing but the credibility of the witnesses to be considered. Uncertainty in this respect affects only the weight of the evidence, not its admissibility, and certainly it has some bearing on the question whether the accused was guilty of the crime to show that the person committing it was of his general appearance, or to show that a person of his general appearance was seen in the vicinity of the place of the crime immediately prior to its commission.

The rule laid down in the *Spadoni* case, *supra,* is still the law. Physical evidence is admissible against the accused so long as it is shown to have some bearing upon the facts at issue. *State v. Duree,* 52 Wn.2d 324, 324 P.2d 1074 (1958).

Error is assigned to the giving of the court's instruction on circumstantial evidence and the refusing of the defendant Smith's proposed instruction No. 9, which was the same as that given by the court except for the following paragraph:

The facts and circumstances relied upon must be consistent with each other, and with the guilt of the defendant. They must also be inconsistent with any hypothesis or theory which would establish or tend to establish the defendant's innocence. Circumstantial evidence meeting these instructions is entitled to the same weight as direct evidence. Strong circumstantial evidence often is the most satisfactory method from which to draw the conclusion of guilt or innocence.

The comparable paragraph in the instruction given by the court reads:

The facts and circumstances relied upon must be consistent with each other, and with the guilt of the defendant. They must be inconsistent with any reasonable theory of innocence. They should be of such character as to exclude every reasonable hypothesis other than that of

guilt. Circumstantial evidence meeting these requirements is entitled to the same weight as direct evidence. Strong circumstantial evidence often is the most satisfactory method from which to draw the conclusion of guilt or innocence.

It will be seen that the defendant's proposed instruction requires that the circumstantial evidence upon which a conviction is based must be inconsistent with *any* hypothesis or theory which would establish or tend to establish the defendant's innocence. The case relied upon by the defendants, *State v. Gillingham*, 33 Wn.2d 847, 207 P.2d 737 (1949), while it uses the language employed by the defendant in one statement of the rule, makes it clear in other statements of it that the hypotheses or theories which must be excluded are only those which are reasonable. It is not necessary that every improbable or absurd hypothesis or theory should also be excluded.

Thus the use of the word "reasonable" in the court's instruction was not error. But the defendants contend that the instruction was erroneous because, although the word "must" was used in the first two sentences of the instruction, the word "should" was used in the third. A similar contention was made in *State v. Redden*, 71 Wn.2d 147, 426 P.2d 854 (1967). In that case, as in this, the state relied upon direct evidence as well as circumstantial evidence. We said there that the test of an instruction is not a matter of semantic difference, but rather whether the jury was misled as to its function under the law. We said further that a jury was not misled as to this function by an instruction that it "should" rather than "must" find circumstantial evidence consistent only with guilt and inconsistent with innocence, where the state relied on direct as well as circumstantial evidence and no theory consistent with innocence was advanced by the defendant.

Here, the only count in support of which the state relied to any substantial degree upon circumstantial evidence was the Hutton murder and robbery. The witness Klepeck identified the defendants as the two men he had seen standing

outside the Drum Room, who followed Hutton to his car and got in. Not more than 10 minutes later the witness Estill saw two men meeting their general description running from the scene of the crime (which was a few minutes drive from 14th Avenue) toward the home of the defendant Riggins, which was about two blocks away. Smith's fingerprint was found in the car. Hutton said that two men he had picked up on 14th Avenue had tried to rob him and had shot him.

While the defendants argue that Hutton might have dropped them somewhere on 14th Avenue and picked up two other men of the same size and build, neither of them testified that this was in fact what happened. Such an occurrence would have indeed been extraordinary. It is not a reasonable hypothesis.

Since the defendants have advanced no theory consistent with innocence upon which a reasonable hypothesis could be based, we conclude that the jury was not misled as to its proper function in evaluating the circumstantial evidence.

For the same reason, it was not error to refuse the defendant Riggins' requested instruction No. 7, to the effect that the jury should adopt a construction of the evidence consistent with innocence, if the testimony was capable of two constructions. Also, as was the case in *State v. Studebaker*, 67 Wn.2d 980, 410 P.2d 913 (1966), the trial court adequately and clearly instructed the jury regarding the state's burden of proof.

The trial court instructed the jury (instruction No. 30)[2] regarding the parole opportunities of a prisoner serving a life sentence, but refused to instruct that the parole board is presumed to do its duty, as requested by the defendants. Under the instruction given, the defendants were not inhibited in arguing to the jury that the parole board could be expected to perform its duties according to the law (*See State v. Dana*, 73 Wn.2d 533, 439 P.2d 403 (1968), but they

---

[2]Instruction No. 30 is apparently frequently given in King County, but it may be incorrect in some details concerning parole board procedures. However, the defendant did not object on this ground.

chose not to do so. The instruction which the court gave made it clear that the parole board is not authorized to release a convict unless it is convinced that his release will not be detrimental to society and that the convict will assume a proper place therein.

■ Error is also assigned to the court's failure to instruct that it was empowered to impose consecutive sentences for the various crimes charged. Since no request was made for such an instruction, the defendants cannot predicate error on the failure to give it. *McGarvey v. Seattle*, 62 Wn.2d 524, 384 P.2d 127 (1963).

Misconduct of the prosecutor is charged. It is alleged that, in his argument to the jury, he distorted the testimony of one of the defendant Smith's witnesses, Dr. William S. Kogan. Dr. Kogan testified concerning Smith's mental age, which he said was between 11 and 12. He also testified that the average individual's mentality is fully developed by age 15 and that, therefore, the average adult has a mental age of 15. The prosecutor referred to this testimony in his argument to the jury. He did not misquote it, and the claim of misconduct is, therefore, unfounded.

The defendants claim that the death penalty was illegally imposed for a number of reasons. We will discuss them under appropriate headings.

### DUE PROCESS

It is first contended that capital punishment is itself a denial of due process. The due process clause of the federal constitution is contained in the Fifth Amendment, which reads:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb, nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The due process clause of the Washington State Constitution is article 1, section 3, which reads: "No person shall be deprived of life, liberty, or property without due process of law."

A reading of these provisions will show that they do not deny to the state the right to deprive an individual of his life. The Fifth Amendment refers specifically to "capital" cases, and also states, as does article 1, section 3, of the state constitution, that a person may not be deprived of his life without due process. The Fifth Amendment also provides that a person may not be twice put in jeopardy of his life. Implicit in these are their corollaries—that the state may deprive an individual of his life if the proceedings are in accord with the requirements of due process and may place him in jeopardy once for a given offense. Certainly, if the state can call upon the most responsible and law abiding of its young men to sacrifice their lives in battle, it has the power, under the constitution, to execute one who, in a proceeding in which the requirements of due process have been strictly observed, has been found by a jury of his peers to have committed a crime so heinous that, in its opinion, his life should be exacted as a penalty.

The due process clauses recognize the right of the state to exact life as a penalty. Therefore, it cannot be said that capital punishment, per se, is a denial of due process. The defendants have cited no case so holding.

A further argument is made that the imposition of the death penalty under the Washington statute, RCW 9.48.030, is a violation of the fourteenth amendment to the United States Constitution (making the Fifth applicable to the states) and article 1, section 3, of the state constitution.

The statute provides, in part:

Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the pen-

alty shall be death, otherwise, it shall be as herein provided. . . . [1919 c 112 § 1; 1913 c 167 § 1; 1909 c 249 § 140; 1891 c 69 § 1; Code 1881 § 786; 1873 p 182 § 12; 1869 p 200 § 12; 1854 p 78 § 12; RRS § 2392.]

It is contended that this statute gives the jury an unlimited, undirected, unreviewable discretion to determine whether the death penalty shall be imposed, and that the failure to provide standards and a right of review is a denial of equal protection and due process. Again, no case so holding is cited. The defendants cite the case of *Giaccio v. Pennsylvania*, 382 U.S. 399, 15 L. Ed. 2d 447, 86 Sup. Ct. 518 (1966), holding unconstitutional a state statute which permitted a jury in a misdemeanor case to assess costs against a defendant, even though it had found him innocent of the offense charged. The court reasoned that this statute gave the jury the power and unlimited discretion to determine the nature of the offense which it was punishing.

The case does not support the defendants' contention in this case. The jury, when it decides whether or not to inflict the death penalty, is not determining the nature of the offense (the offense is the crime for which the penalty is inflicted), furthermore, the United States Supreme Court, in the cited case, said in a footnote, at 405:

> In so holding we intend to cast no doubt whatever on the constitutionality of the settled practice of many States to leave to juries finding defendants guilty of a crime the power to fix punishment within legally prescribed limits.

As we said in *State v. Aiken*, 72 Wn.2d 306, 434 P.2d 10 (1967), the viciousness and callousness of the killings are matters which the jury necessarily considers in determining whether to impose the death sentence. Circumstances mitigating against it, if shown by the evidence, are also to be considered. The jury does not need express instructions that it should consider these matters. They are all a part of the evidence, and properly considered by the jury in reaching its decision.

While the defendants argue vigorously that there should be express standards, they leave it to the court's imagina-

tion to conceive what those standards might be and whether, if applied to the defendants' conduct, they would dictate a different decision than that reached by the jury in this case. They also urge that they should have been allowed to present evidence bearing on those standards, but they do not suggest that any such evidence offered by them was rejected. The trial court was liberal in allowing evidence in mitigation, and the defendants do not contend otherwise. Their position seems to be that the court should have invited them to submit further evidence, rather than that they proposed it and were refused. This proposition is without supporting authority.

The defendants, having the burden of establishing the unconstitutionality of a challenged statute, have failed to cite any case holding that a statute such as ours, which allows the jury to determine whether the penalty in a first degree murder case shall be death or a life sentence, is invalid.

Assuming that, if this court were persuaded that standards should be provided, it would have the power and duty to expand the interpretation of the due process and equal protection clauses so as to embrace a requirement that the legislature provide such standards, the defendants have failed to advance a convincing argument that this is indeed the case. The fact that they are unable to conceptualize the proper standards illustrates the inappropriateness of an attempt to promulgate such standards. The evil which they suggest as the probable effect of the failure to instruct on standards is that the jury is likely to make its decision according to whim or prejudice. This supposes that 12 jurors, examined and approved by counsel for the defendants, will share a common whim or prejudice. It also suggests that the jury will be inclined to disregard the court's instruction to try the case upon the evidence. If a jury is unwilling to obey this instruction of the court, it would be just as apt to disobey an instruction that it should take into account "A," "B," and "C" when it considers what the penalty should be.

We hold that RCW 9.48.030 is not invalid because it fails to provide standards to guide the jury in determining whether the death penalty shall be imposed upon one whom it has found guilty of murder in the first degree.

The defendants have also failed to cite any authority supporting their suggestion that the jury's verdict on the penalty should be subject to review. It is in fact reviewable by the Governor, who is empowered to commute it. The defendants' contention not being meritorious on its face and being unsupported by cited authorities, it cannot be sustained.

## SIMULTANEOUS SUBMISSION OF ISSUES OF GUILT AND PUNISHMENT

It is contended that the submission to the jury of the issues of guilt and punishment in a single trial resulted in the denial to the defendants of the right to present evidence on the issue of punishment. This contention is patently without merit, inasmuch as neither defendant was denied the right to present whatever evidence he thought relevant and desirable on this issue. The defendant Smith presented evidence about his background and capabilities; the defendant Riggins did not see fit to do so. Defense counsel also argued to the jury the reasons why the death penalty is considered by many to be unwise and unnecessary to effect the legitimate aims of society.

The defendant Riggins objected to the defendant Smith's proposal that the trial court order separate trials on the issues of guilt and punishment. He cannot now be heard to claim that the denial of such a trial deprived him of a right.

The defendants argue that they were inhibited in the presentation of favorable background evidence because of their knowledge of the prosecution's right to counter such evidence with unfavorable evidence. No such evidence was offered by the prosecution in this case, even though the defendant Smith offered favorable evidence in his own behalf. Our examination of the record shows that he was not inhibited in fact. Had the trial been bifurcated, the prosecution need not have feared possible error in offering unfa-

vorable evidence and might well have done so, in which case an even more unsympathetic picture of the defendants would have gone to the jury.

It may be true that the advantages of a bifurcated trial outweigh the disadvantages to the defendants; but the defendants themselves do not appear to be altogether certain of this, particularly the defendant Riggins, who objected to the procedure when it was proposed to the trial court. We think it is a matter to be presented to the legislature, there being no authorities cited supporting the defendant Smith's right to demand such a trial.

### CRUEL AND UNUSUAL PUNISHMENT

The eighth amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Article 1, section 14, of the Washington State Constitution also provides that "cruel punishment" shall not be inflicted.

The contention of the defendants here is that the death penalty, even when executed in such a way as to cause a minimum of physical suffering, violates these provisions.

As in the case of the defendants' argument that the taking of life by the state in itself is a denial of due process, the constitutions refute the defendants' contention. Both constitutions recognize the validity of capital punishment, the federal constitution in amendment 5 and the state constitution in article 1, section 20, which provides that all persons charged with crime shall be bailable, except for capital offenses when the proof is evident or the presumption great.

By any dictionary, including Black's Law Dictionary, a capital offense is one punishable by death. The only way these provisions of the two constitutions can be reconciled with provisions forbidding cruel punishment is to conclude that the framers did not consider capital punishment, per se, to be either cruel or unusual, in the sense in which they used those terms in the constitutions.

Again, the defendants cite no authorities supporting their proposition that the infliction of capital punishment violates these constitutional provisions.

The Supreme Court of the United States has upheld the validity of executions by shooting (*Wilkerson v. Utah,* 99 U.S. 130, 25 L. Ed. 345 (1878)). Other cases in which the penalty has been approved include *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 91 L. Ed. 422, 67 Sup. Ct. 374 (1947), *rehearing denied* 330 U.S. 853, 91 L. Ed. 1295, 67 Sup. Ct. 673; *Williams v. New York,* 337 U.S. 241, 93 L. Ed. 1337, 69 Sup. Ct. 1079 (1949), *rehearing denied* 337 U.S. 961, 93 L. Ed. 1760, 69 Sup. Ct. 1529, *rehearing denied* 338 U.S. 841, 94 L. Ed. 514, 70 Sup. Ct. 34; and *Williams v. Oklahoma,* 358 U.S. 576, 3 L. Ed. 2d 516, 79 Sup. Ct. 421 (1959), *rehearing denied* 359 U.S. 956, 3 L. Ed. 2d 763, 79 Sup. Ct. 737. Also, the recent case of *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 Sup. Ct. 1770 (1968), tacitly recognizes the right of a state to provide for the death penalty.

The defendants do not suggest that the means of execution provided by the statutes of this state is unnecessarily cruel. They do argue vigorously and persuasively that the pronouncement of the death sentence, whatever the means to be used in its execution, subjects the condemned individual to great mental and emotional agony; that the execution of an individual by society is premeditated killing and is immoral; that it is not a deterrent to anyone except the person executed, and that it thwarts the legitimate purposes of rehabilitation. It might also be added that it destroys valuable subject matter for the scientific study of the causes of crime.

These are all arguments which should be addressed to the legislature, and which have prevailed in the legislatures of a number of states.[3] If, as the defendants maintain, "upwards of fifty percent" of the people today are opposed to the death penalty, an effort to obtain the elimination of this penalty should have a considerable chance of success.

---

[3]*See* Bedau, *The Death Penalty in America* (Anchor Books, 1964).

## Exclusion of Jurors Opposing
## The Death Penalty

The prosecutor was permitted to successfully challenge for cause those jurors who said that they were opposed to the death penalty and who said further that their opposition to the penalty would prevent them from voting for that penalty in any case.

■ Eloquent and vigorous argument is made by the defendants that excluding persons who are opposed to the death penalty results in the exclusion of many of the more enlightened members of society and thus denies to the defendants a jury composed of a cross-section of society. We need not discuss this argument further than to say that it has recently been considered by the United States Supreme Court in *Witherspoon v. Illinois, supra,* and there approved to this extent: The court held that a jury is improperly constituted if the court has excluded therefrom veniremen who are opposed to the death penalty but who can say that, in spite of their opposition, they could, in a proper case, impose the death penalty.

The state statute under consideration in that case provided that any juror opposed to the death penalty could be challenged for cause. In its footnote 21, in *Witherspoon v. Illinois, supra,* the court said:

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* (p. 522)

In the case before us, the six veniremen who were excluded were questioned specifically on these two matters. They all answered in the affirmative to the first question and in the negative to the second.

The applicable statute in this state is RCW 10.49.050, providing:

No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense.

This statute was adopted in its present amended form in 1891 (Laws of 1891, ch. 28, § 67, p. 59) at which time the penalty for murder in the first degree was a mandatory death penalty, subject to the Governor's power of commutation.

It is apparent that this statute is not open to the objection successfully launched against the Illinois statute; that is, today it does not provide for the automatic exclusion of veniremen opposed to the death penalty, but only those whose opposition renders them unwilling in any case to find the defendant guilty. Also, the proceedings in the selection of the jury were in accord with the requirements laid down in the *Witherspoon* case.

The defendants argue, however, that the Washington statute does not authorize a challenge for cause unless the prospective juror's opposition to the death penalty will preclude him from finding the defendant guilty. A literal reading of the statute will lead to this conclusion. However, it must be remembered that when the statute was enacted, a finding of guilty automatically resulted in the death penalty. Now, the jury returns separate verdicts on guilt and punishment, and, as the questioning of the veniremen in this case amply illustrates, an individual's opposition to capital punishment need not affect his verdict on the question of guilt. He may in good conscience find the defendant guilty, even though his conscience will not permit him to vote for the death penalty.

Since the statute has not been repealed, although the first degree murder statute has been amended so as to allow the jury discretion in imposing the sentence, it can now have logical application only to the venireman's ability to vote

for the death penalty. We indicated our approval of such an interpretation in *State v. Aiken,* 72 Wn.2d 306, 434 P.2d 10 (1967).

■ But, even assuming that the defendants are correct in their interpretation of this statute, the trial court nevertheless had discretion to sustain the prosecution's challenges for cause, under the provisions of RCW 10.49.040, which reads:

Challenges for cause shall be allowed for such cause as the court may, in its discretion, deem sufficient, having reference to the causes of challenge prescribed in civil cases, as far as they may be applicable, and to the substantial rights of the defendant.

Among the causes for challenge in civil actions is

[A] state of mind on the part of the juror in reference to the action, or to either party, which satisfies the trier in the exercise of a sound discretion, that he cannot try the issue impartially and without prejudice to the substantial rights of the party challenging, . . . . (RCW 4.44.170; CR 47(e)(5).)

As we indicated in *State v. Aiken, supra,* a juror whose opposition to the death penalty is such that he could never impose it cannot try the case impartially and without prejudice to the substantial right of the state to have the state exercise the discretion vested in it by law.

Although we appreciate the earnestness with which counsel contend that a juror whose conscience will not allow him to vote for the death penalty is in fact "exercising his discretion," we cannot accept their logic. A person whose mind has already settled one of the issues to be presented to him in the trial, before the trial begins, is in no position to exercise any discretion at all, much less a sound discretion. He cannot consider and evaluate the evidence, he cannot weigh conflicting factors, and he cannot consider and evaluate the opinions of his fellow jurors.

A juror whose mind is made up for the very commendable reason that he is opposed to the taking of a life by society is no more able to exercise discretion on the question of penalty than is one whose mind is made up in

advance that he will automatically vote for the death penalty in every case involving first degree murder, absent a showing of legal insanity. Just such a juror as the latter was successfully challenged in this case, and the defendants make no contention that he should have been allowed to serve, as a representative of that portion of society which is unalterably in favor of the death penalty.

We conclude that the trial court did not err in sustaining the prosecutor's challenges for cause, based on the assertion by prospective jurors that they could not in any event vote to impose the death penalty.

## RACIAL PREJUDICE

The defendants next make rather an extended argument that juries are biased against Negroes and that the number of black persons condemned to death is therefore disproportionate to the number of whites. However, they do not cite statistics which show that this is true in the state of Washington, and they do not claim that their own jury was biased, that they were unduly restricted in searching for bias in the minds of prospective jurors, or that Negroes were excluded from serving on that jury, systematically or otherwise. They cite authorities for the proposition that the existence of such bias can be shown "objectively and statistically." They then ask the court to take judicial notice of the "objective facts" and "statistics." But they do not tell us where they can be found, except in our own cases which supposedly would supply the statistics.

The court can perhaps take judicial notice of the fact that racial bias is widespread, and that the public is becoming increasingly conscious of it and of the necessity of eliminating it. But this does not tell us how a jury may be selected which is free of it, and it does not tell us what was done or omitted in this case which could have prevented it, assuming that it did exist. The only objective evidence before us is that the defendants are Negroes, and they were condemned to death by the jury. We do not know how many, if any, Negroes served on the jury. We do not know

whether, if there were black jurors, they were prejudiced against law violators of their own race. We do know that the crimes of which the defendants were accused, and of which there was ample evidence of guilt, were deplorable and senseless, and that no evidence was offered and no argument made tending to excuse or justify them. It would be difficult for this court to say that, if the death penalty is ever justified, it is not justified in a case such as this.

 Since the defendants can point to no error in the proceedings which resulted in their being tried by a jury infected with racial bias, and have not cited objective facts or statistics which would lead to the conclusion that the jury was inevitably so constituted, we cannot find merit in their contention. To hold on the scant evidence before us that the defendants were subjected to a biased jury would be equivalent to holding that all juries are inherently biased, and all judges the same, and a fair trial cannot be had at all in society's present state of development. This may be true, but still the judicial system is required by the people to function, and it can only do so by utilizing human beings, imperfect though we are.

The record in this case discloses that it was tried by a judge who was extremely careful and conscientious concerning the rights of the defendants, that it was prosecuted with restraint, and that the defendants were represented by counsel—most of them court appointed—who were highly capable and who defended them with great vigor and resourcefulness. The length of this opinion and the number of assignments of error which we have called upon to discuss demonstrates the devotion and thoroughness with which defense counsel approached their task. It can be agreed that there are many regrettable aspects of life which influence deeds such as those of the defendants, and lead to verdicts such as that which was rendered in this case; but insofar as this court is able to judge, the denial of

a fair trial, as the law in its present state can provide it, was not one of these.

The judgment is affirmed.

ALL CONCUR.

January 8, 1969. Petition for rehearing denied.