**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45772-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| MICHAEL ANTHONY BRUCE, | |
| Appellant. | |

BJORGEN, J. — The State charged Michael Anthony Bruce with first degree burglary, third degree theft, residential burglary, and several violations of a domestic violence court order, based on conduct against his former intimate partner Heather Reid. A jury returned guilty verdicts on all counts. Bruce appeals, arguing that the trial court erred by (1) joining certain of the charges for trial and denying his subsequent motion to sever those charges and (2) entering convictions for both first degree burglary and residential burglary based on a single unlawful entry into Reid's apartment, thus putting Bruce in double jeopardy. Accepting the State's concession, we reverse the residential burglary conviction on double jeopardy grounds, but otherwise affirm.

FACTS

Bruce and Reid had a dating relationship for two or three years during which Bruce lived at Reid's ground-level apartment in Vancouver, Washington for about six months. Reid broke up with Bruce in October 2012, and Bruce moved out of Reid's apartment. Reid broke off the relationship completely in January 2013. Bruce refused to accept her decision to terminate the relationship.

On January 17, 2013, the District Court of Clark County entered an order prohibiting Bruce from contacting Reid or knowingly coming within 250 feet of her residence, and the same court entered a similar order on April 5. Both orders bore Bruce's signature and by their terms remained in effect for two years from the date of entry with the court.[1]

1.      The Events of June 28 to 30, 2013

On the night of June 28, Bruce showed up at Reid's apartment after her children had gone to bed. Reid told him to leave, but let him in after he threatened to "make a scene." 1 Verbatim Report of Proceedings (VRP) at 68. Bruce asked if Reid's children would be at her apartment the following night, and Reid said they would not. Reid and Bruce argued, but Bruce stayed at Reid's apartment until the morning.

The following night, June 29, Reid awoke to Bruce touching her arm. Bruce told Reid to be quiet and not get mad. Bruce grabbed Reid's wrists, held her down, and covered her nose and mouth with his hand to stop her from yelling. Reid could not breathe, so she stopped yelling, hoping that Bruce would remove his hand from her mouth.

Bruce released her, and Reid jumped out of bed, again yelling for him to leave. At some point, Reid turned on the bedroom light and could clearly see Bruce. Bruce then cornered Reid in the bathroom adjoining her bedroom, telling her to stop yelling and to be quiet. When Reid did not stop yelling, Bruce punched her in the jaw. Reid began crying, and Bruce finally left the apartment.

---

[1] The trial court admitted certified copies of the orders at trial, but they do not appear in the record. These facts come from the trial testimony of the district court office manager, who authenticated the certified copies. Bruce did not dispute at trial that the orders existed or that he knew of them.

In the morning, Reid could not find her cell phone, but did find a vase of flowers in her bathroom that she did not recognize. She later found flowers in various other places around her apartment, including in her daughter's bedroom.

Reid used her mother's cell phone to send text messages to her own phone number, demanding return of the phone and threatening to call the police if not returned. She did not receive a reply, so she called the police. Clark County Sheriff's Deputy Doug Paulson met Reid at her apartment and interviewed her and her mother. Paulson noticed "some light bruising" on Reid's right wrist. 1 VRP at 36.

Reid's missing cell phone had a Facebook application that allowed the user to access Reid's account without entering a password. Reid discovered that someone had sent messages from her Facebook account, time stamped after her cell phone went missing, to four men on her contact list. The content of the messages included, for example, "I told you to stop talking to Heather," "I can't believe you would do this," "I thought you were the [sic] homie," 1 VRP at 48, "How could you do this?" 1 VRP at 49, and demands that the recipients leave Reid alone.

Similarly, Reid's cousin Shayleen Migneault received a text message from Reid's cell phone number the next day, July 1, stating, "I'm not okay. I need mental help. I need help." 1 VRP at 111. The following day, July 2, Migneault received an angry, threatening call that her phone identified as originating from Reid's cell phone number, but recognized Bruce as the caller by his voice, with which she was familiar.

2.      The Events of September 5, 2013

In the early afternoon of September 5, a witness observed Bruce knocking on the door of Reid's residence. Linda McCluskey, who was supervising one of Reid's children, heard the knocking but did not answer. Bruce kept knocking and started ringing the doorbell over and over until McCluskey answered the door. She told Bruce that he was not supposed to be there and that she was going to call 911. Bruce swore at her and left. McCluskey called the police and gave a statement.

Bruce returned to Reid's residence later that evening, after Reid had arrived home. He knocked on the window and asked to come in. Reid told him to leave. Bruce started continually ringing the doorbell and demanding to come in, at which point Reid called 911. When officers arrived they arrested Bruce outside Reid's apartment building.

When Clark County Sheriff's Deputy Daniel Fronk, one of the responding officers, questioned Bruce about his activities on June 29 and 30. Bruce denied visiting Reid's apartment on those occasions and claimed to have an alibi. Bruce told Fronk that he had been at Cathedral Park, but did not identify anyone who could corroborate his alibi.

3.      September to October Postcards

A few days after the September 5 incident, Reid received a handwritten postcard from Bruce addressed to Bruce's daughter at Reid's mailing address. Reid received another six such postcards over the next month. On October 23, Reid called 911 to report the postcards and eventually turned them over to police.

Clark County Sheriff's Deputy Robert Anderson responded to the call and questioned Bruce, who admitted to sending the postcards, but told Anderson that he had sent them to his daughter. When Anderson pointed out that Bruce had sent the letters to Reid's address, Bruce

responded, "I wasn't trying to violate no order or anything." 2 VRP at 168-69. Bruce also claimed to have mistakenly addressed the postcards to Reid and claimed that his daughter lived at Reid's apartment when he sent the postcards.

PROCEDURAL HISTORY

In September 2013, the State filed charges against Bruce for first degree burglary, felony domestic violence court order violation, and third degree theft based on the June 29 and 30, 2013 incident at Reid's apartment. On November 21 the State filed a motion to consolidate these charges with Bruce's four counts of misdemeanor violations of a domestic violence court order, based on his September 2013 visit to Reid's residence and the subsequent postcards. After considering Bruce's memorandum in opposition, the trial court granted the motion to consolidate the charges. The State amended the information accordingly and added a domestic violence residential burglary charge.

Bruce pled not guilty and proceeded to a jury trial. The State called Reid, Kraft, Migneault, McCluskey, and various law enforcement officers, who testified to the facts as set forth above. Reid testified also that Bruce's daughter had never lived at Reid's residence.

A number of inconsistencies in Reid's statements also emerged at trial. Clark County Sheriff's Deputy Doug Paulson, one of the investigating officers, testified that Reid initially told him that Bruce was left-handed and had hit her on the right side of her face. At trial, Reid testified that she did not remember whether Bruce was right or left-handed. Reid also admitted that she initially told police and the defense investigator that she had not seen Bruce for some time prior to the night of July 29. Reid explained that she lied because she was embarrassed, thought she "would get in trouble" for violating the no contact orders, and "wanted to say

whatever it took to make sure that . . . an incidence [sic] like this d[id] not happen to [her] children ever again." 1 VRP at 94.

Following Reid's testimony, Bruce moved to sever the four counts arising out of the September 2013 events, pointing out that Reid had testified that Bruce's pattern of behavior on June 30 was the same as his behavior on September 5 and arguing that severance was justified by the risk the jury would decide guilt concerning the latter incident based on evidence of the former. The trial court denied the motion, stating that it was familiar with the issue from the previous hearing and argument and didn't see anything new presented.

After the State rested, Douglas and Michelle Schmer, friends of Bruce's with whom he lived from January to mid-August 2013, testified that they remembered the weekend of June 28 to 30 because they were preparing for their twins' birthday party. They admitted, however, that they did not become aware of the significance of the weekend until the following September. The Schmers testified that Bruce was at their house on June 28 until dark and that they all watched movies together before going to bed.

Douglas Schmer testified that on June 29, he and Bruce attended a friend's party at Cathedral Park, returned to the Schmers' home together, then went to bed sometime after 11:00 p.m. or 12:00 a.m. that night. Reid's mother, Laura Sweider, testified that she attended the party and saw Bruce and Douglas there. The Schmers testified that Bruce could not have left their house without setting off the security alarm, which did not go off.

Bruce testified on his own behalf, averring that he did not leave the Schmers' house or go to Reid's apartment on June 28. Bruce denied going to Reid's apartment on the night of June 29, as well, testifying consistently with Douglas's account.

Bruce also called defense investigator Steven Teply. Teply testified that Reid made various statements to him that were inconsistent with her trial testimony and statements to police. For example, Reid told Teply that her relationship with Bruce ended much later than she adverted to in her trial testimony: Reid told the investigator that she had broken off the relationship a week before the events of June 29 and 30, 2013, and later told him it ended two weeks or a month before those events.[2] Teply also testified that, when he interviewed Reid, she told him that she believed Bruce was right-handed.[3]

With respect to the multiple charges, the court instructed the jury as follows: "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." Clerk's Papers (CP) at 134. The jury returned guilty verdicts on all counts. The court entered convictions on all charges, including third degree theft, residential burglary, and first degree burglary, and imposed the maximum standard range sentence. Bruce appeals.

ANALYSIS

We first address Bruce's claim that consolidating the charges arising out of the June incident with those arising out of the September incident and the subsequent postcards deprived him of a fair trial. We then consider whether entry of convictions for both first degree burglary and residential burglary placed him in double jeopardy.

_____

[2] Reid testified at trial that she broke off her relationship with Bruce in January 2013.

[3] Paulson testified that Reid initially told him that Bruce was left-handed and had hit her on the right side of her face.

I. CONSOLIDATION OF THE CHARGES

Bruce argues that the trial court erred by (1) granting the State's motion to join the four charges arising from the June incident with the remaining charges and (2) denying his subsequent severance motion. The State maintains that the trial court did not abuse its discretion. We agree with the State.

Washington's liberal joinder rule allows charges to be consolidated in a charging document if they are "based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." CrR 4.3(a)(2); *State v. Thompson*, 88 Wn.2d 518, 525, 564 P.2d 315 (1977), *overruled on other grounds by State v. Thornton*, 119 Wn.2d 578, 835 P.2d 216 (1992). A statute similarly provides in relevant part that, "[w]hen there are several charges against any person . . . for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, . . . the court may order such indictments or informations to be consolidated." RCW 10.37.060. We construe the joinder rule expansively to promote the public policy of conserving judicial and prosecutorial resources. *State v. Bryant*, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998).

We review a trial court's denial of a motion to sever for a manifest abuse of discretion. *Bryant*, 89 Wn. App. at 864. The trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons. *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). Untenable grounds or reasons exist where the trial court relied on facts unsupported in the record, applied the wrong legal standard, or adopted a view that "'no reasonable person would take.'" *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990)).

A.    Joinder

We have held that connections between charged offenses much less substantial than those presented here sufficient to justify joinder. *E.g.*, *State v. Gatalski*, 40 Wn. App. 601, 606, 699 P.2d 804 (1985), *overruled on other grounds as stated in State v. Harris*, 121 Wn.2d 317, 849 P.2d 1216 (1993); *State v. Weddel*, 29 Wn. App. 461, 465, 629 P.2d 912 (1981). Notably, in *Gatalski*, where the State charged the defendant with attempted rape and attempted kidnapping based on incidents five months apart and involving different victims, we held joinder proper because both involved use of force against female victims, sexual connotations, and the victims allegedly made voluntary romantic overtures toward the defendant. *Gatalski*, 40 Wn. App. at 603-06.

All the charges here stemmed from conduct involving the same victim and, as shown by the facts recited above, were animated by the same motive: that of attempting to reestablish contact after a failed relationship. Thus, under CrR 4.3(a)(2) and implementing case law, noted above, they were sufficiently connected to warrant joinder. Consequently, even though the trial court's order on consolidation did not express its reasoning, it met the governing standards and cannot be deemed a manifest abuse of discretion.

B.    Severance

CrR 4.4 gives a trial court discretion to sever counts joined or consolidated under CrR 4.3 if it "determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b); *State v. Bythrow*, 114 Wn.2d 713, 717, 790 P.2d 154 (1990). A defendant seeking severance of charges must demonstrate that a joint trial would be "so manifestly prejudicial as to outweigh the concern for judicial economy." *Bythrow*, 114 Wn.2d at 718. Circumstances posing a risk of prejudice sufficient to merit severance include

9

those where (1) the defendant "may become embarrassed or confounded in presenting separate defenses," or the jury (2) may "cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find," or (3) infer a criminal disposition from evidence presented on some charges, then rely on that inference to find the defendant guilty of others. *Bythrow*, 114 Wn.2d at 718 (internal quotation marks omitted).

Our Supreme Court has identified four considerations in determining whether charges should be severed to avoid prejudice to a defendant: "'(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.'" *State v. Sutherby*, 165 Wn.2d 870, 884-85, 204 P.3d 916 (2009) (quoting *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)). We address each factor in turn in determining whether the trial court abused its discretion in denying Bruce's motion to sever.

1. Relative Strength of the State's Evidence on Different Counts

Where the State presents "strong [evidence] on each count, there is no necessity for the jury to base its finding of guilt on any one count on the strength of the evidence of another." *Bythrow*, 114 Wn.2d at 721-22. But a disparity in the strength of the evidence on various charges favors severance if "a jury is likely to be influenced in its determination of guilt or innocence in the weak cases by evidence in the strong case." *State v. Hernandez*, 58 Wn. App. 793, 801, 794 P.2d 1327 (1990).

In *State v. Kalakosky*, 121 Wn.2d 525, 538-39, 852 P.2d 1064 (1993), for example, our Supreme Court upheld a trial court's refusal to sever five rape charges, each involving a different victim, in part because strong physical evidence corroborated each victim's account. In *Hernandez*, on the other hand, the State presented only uncorroborated testimony from a single

eyewitness on two of three robbery counts, while three eyewitnesses independently identified Hernandez with a high degree of confidence as the perpetrator of the crime charged in the remaining count. 58 Wn. App. at 800-01. We reversed two of the three robbery convictions because the "jury [was] likely to be influenced in its determination of guilt or innocence in the weak cases by evidence in the strong case." *Hernandez*, 58 Wn. App. at 801.

Here, Bruce admitted to the jury that he went to Reid's apartment twice on September 5, 2013, and subsequently sent her the postcards. Thus, the evidence that he committed the crimes charged in the counts relating to those incidents could hardly be stronger.

The evidence with respect to the charges arising from the June 30 incident is weaker. The State's case relied primarily on the testimony of Reid, the only eyewitness to that incident. As Bruce points out, inconsistencies between Reid's trial testimony and her prior statements cast doubt on her credibility as a witness. Reid admitted she had lied to police because she would "say whatever it took to make sure that . . . an incidence [sic] like this d[id] not happen to [her] children ever again." 1 VRP at 94.

Some physical evidence tended to corroborate Reid's version, such as the bruises visible on her arm and the flowers around her apartment, although it did not specifically point to Bruce as the perpetrator. Migneault's testimony, that she received a call from Bruce of which her caller identification service identified as originating from Reid's missing cell phone, more directly implicated Bruce. On the other hand, two witnesses corroborated Bruce's alibi for the night in question.

Although the State presented substantial evidence as to the charges stemming from the June incident, it had a much stronger case with respect to the charges based on the September incident and the postcards. Thus, a joint trial posed some risk that the jury would find Bruce

11

guilty of the former charges based on the evidence presented on the latter. This factor weighs in favor of severance.

2. Clarity of Defenses

The second factor concerns the possibility that failure to sever charges will force defendants to present antagonistic defenses. The defendant bears the burden of showing "specific prejudice" from any possible antagonistic defenses. *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982).

Bruce presented an alibi defense for the charges arising from the June 30 events, but admitted to the remaining charges.[4] Bruce argues that the presentation of his admission to some charges together with his denial and alibi defense to the others likely confused the jury.

In *Russell*, the defendant denied committing all the charged crimes and argued on appeal that the trial court should have severed the counts. 125 Wn.2d at 64-65. In holding that the clarity-of-defenses factor weighed against severance, our Supreme Court noted that "[t]he likelihood that joinder will cause a jury to be confused as to the accused's defenses is very small where the defense is identical on each charge" and quoted with approval the trial court's distinction between Russell's case and one where "there will be an admission of one [charge and] denial of another." *Russell*, 125 Wn.2d at 64-65.

Here, however, we see little likelihood of jury confusion from these clearly differentiated defenses. Further, Bruce's admission as to one set of charges and denial as to the other do not qualify as irreconcilable so as to make severance mandatory: accepting Bruce's concession as to one set of charges does not of logical necessity require the jury to reject his alibi defense to the

---

[4] At the hearing on the State's joinder motion, Bruce informed the court that he did not anticipate calling any witnesses in defense against the charges arising from the September incident and the subsequent postcards.

12

others. *See State v. Johnson*, 147 Wn. App. 276, 285, 194 P.3d 1009 (2008) ("For defenses to be irreconcilable, they must be 'mutually exclusive to the extent that one [defense] must be believed if the other [defense] is disbelieved.'") (quoting *State v. McKinzy*, 72 Wn. App. 85, 90, 863 P.2d 594 (1993)). On the other hand, where a defendant admits to certain charges while denying others, the jury may improperly rely on the admission to find the denial incredible.

The clearly differentiated and reconcilable nature of these defenses weighs against severance, while the risk that the jury would rely on Bruce's admission to the latter charges to reject his alibi defense to the June charges weighs in favor of severance. This criterion does not clearly weigh in either direction.

3. Instruction To Decide Each Count Separately

The third factor concerns the trial court's instructions. As discussed, the trial court gave the standard instruction that the jurors "must decide each count separately" and that their "verdict on one count should not control [their] verdict on any other count." CP at 134. We presume that jurors follow such instructions. *State v. Swan*, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990). Given this presumption, this factor weighs against severance.

4. Admissibility of Evidence on Different Charges in Separate Trials

The final factor requires us to consider whether the evidence on particular charges would be admissible in a separate trial on the other charges. Where the State could introduce the evidence relating to each charge even if tried separately, the defendant incurs no additional risk of unfair prejudice in a joint trial. *See State v. Smith*, 74 Wn.2d 744, 756, 446 P.2d 571 (1968), *judgment vacated in part by Smith v. Washington*, 408 U.S. 934 (1972). The State argues that the trial court could have properly admitted evidence concerning the September/October charges in a separate trial on the June charges because "Bruce's frightening behavior on September 5th

13

showed a common scheme on his part of showing up at [Reid's] apartment unannounced and uninvited and behaving threateningly, if not violently, while seeking entry or after gaining entry." Br. of Resp't at 17.

ER 402 provides that "[e]vidence which is not relevant is not admissible."[5] ER 403 provides that the trial court may exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Finally, ER 404(b) forbids the admission of propensity evidence; that is, "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person" for the purpose of showing that the person acted in conformity with that character on some other occasion.

ER 404(b) also states that evidence "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Our Supreme Court has held evidence of other acts admissible under the rule if it "serves a legitimate purpose, is relevant to prove an element of the crime charged, and, on balance, the probative value of the evidence outweighs its prejudicial effect." *State v. DeVries*, 149 Wn.2d 842, 848-49, 72 P.3d 748 (2003). The court has also specified, however, that "[i]n cases where admissibility is a close call, 'the scale should be tipped in favor of the defendant and exclusion of the evidence.'" *Sutherby*, 165 Wn.2d at 886-87 (quoting *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)).

Trial courts may admit evidence under ER 404(b) of a defendant's other acts "to show the existence of a common scheme or plan" in two circumstances: (1) "'where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan'" and

---

[5] ER 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more . . . or less probable than it would be without the evidence."

(2) where "'an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.'" *State v. Gresham*, 173 Wn.2d 405, 421-22, 269 P.3d 207, 214 (2012) (quoting *State v. Lough*, 125 Wn.2d 847, 854-55, 889 P.2d 487 (1995)). The State's argument appears to rely on the latter type of circumstance, focusing on the similarities between the June and September incidents.

We rejected a similar argument in *State v. Harris*, 36 Wn. App. 746, 747-48, 751, 677 P.2d 202 (1984), where the defendants faced charges stemming from two very similar rapes in the same trial. There, the State argued that the rapes were parts of a common scheme or plan because "both victims voluntarily entered vehicles with the defendants and in both instances the defendants drove the victims against their will to a location where the rapes occurred." *Harris*, 36 Wn. App. at 751. The *Harris* court noted that "the State has fallen into the common error of equating acts and circumstances which are merely similar in nature with the more narrow common scheme or plan." *Harris*, 36 Wn. App. at 751.

Our Supreme Court subsequently held that "admission of evidence of a common scheme or plan requires substantial similarity between the [other] acts and the charged crime." *State v. DeVincentis*, 150 Wn.2d 11, 21, 74 P.3d 119 (2003). Other than the fact that it involved the same victim, Bruce's conduct giving rise to the September/October charges, demanding that she let him in, and sending postcards from jail, has little in common with the June incident, where he entered Reid's home at night while she slept, brought flowers, assaulted her, and took her phone. The incidents are not sufficiently similar to qualify as a common scheme or plan where an individual devises a plan and uses it repeatedly to perpetuate separate but very similar crimes. *Gresham*, 173 Wn.2d at 422.

15

The conduct underlying the charges, however, does qualify as a common scheme or plan where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan, the other set of circumstances described in *Gresham*, 173 Wn.2d at 422. That is, the evidence indicates that all of Bruce's efforts to contact Reid served his overarching goal of convincing or compelling her to resume their intimate relationship. Further, Bruce denied entering Reid's apartment on the night of June 29, assaulting her, leaving flowers, or taking her phone. His subsequent visits to Reid's apartment and the mailing of postcards strongly indicated that, months later, he remained so determined to resume a relationship with her that he would disregard the no-contact orders and take extreme measures to rekindle the relationship. The subsequent visits and the postcards were thus probative as to the veracity of his alibi defense against the charges arising from the June incident.

The trial court could have admitted evidence of one set of charges in a separate trial on the other set. Thus, Bruce fails to show that he necessarily incurred any additional risk of unfair prejudice by facing the charges in a single trial. This factor also weighs against severance.

As set out above, a trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds or reasons. As just shown, the trial court's denial of severance is consistent with the criteria in *Sutherby*. Further, Bruce fails to meet his burden of establishing prejudice of the kinds identified in *Bythrow*, 114 Wn.2d at 718, that require severance as a matter of law. Thus, the trial court did not abuse its discretion by denying Bruce's severance motion.

## II. DOUBLE JEOPARDY

Bruce argues that entry of convictions for first degree burglary and residential burglary placed him in double jeopardy because the residential burglary conviction rested on the same

evidence used to prove the first degree burglary. He therefore asks us to reverse and dismiss the residential burglary conviction. The State concedes the error and agrees as to the remedy. We accept the State's concession.

Because the burglary statutes do not expressly permit multiple punishments for the same underlying conduct,[6] we determine whether the two convictions amount to double jeopardy using the "same evidence" test. *State v. Hughes*, 166 Wn.2d 675, 681-82, 212 P.3d 558 (2009). Under this test, "if the crimes, as charged and proved, are the same in law and in fact, they may not be punished separately absent clear legislative intent to the contrary." *State v. Freeman*, 153 Wn.2d 765, 777, 108 P.3d 753 (2005). In this inquiry, we must "consider the elements of the crimes as charged and proved, not merely at the level of an abstract articulation of the elements." *Freeman*, 153 Wn.2d at 777. Absent a clear showing of contrary legislative intent, multiple punishments for the same act violate the prohibition against double jeopardy if "'the evidence required to support a conviction upon one of [the charged crimes] would have been sufficient to warrant a conviction upon the other.'" *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 820, 100 P.3d 291 (2004) (emphasis omitted) (alteration in original) (quoting *State v. Reiff*, 14 Wash. 664, 45 P. 318 (1896)).

As relevant here, a person commits first degree burglary if "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and . . . , while in the building . . . assaults any person." RCW 9A.52.020. A person commits residential burglary "if, with intent to commit a crime against a person or property therein, the

_____

[6] A statute does expressly authorize punishment for both a burglary and the crime committed inside a building that makes the unlawful entry or remaining qualify as a burglary. RCW 9A.52.050. The statute does not purport, however, to allow for two separate burglary convictions based on the same unlawful entry.

person enters or remains unlawfully in a dwelling." RCW 9A.52.025. These may at first appear different in law, as the first requires proof of an assault, which the second does not, and the second requires proof of unlawful entry or remaining in a dwelling, while the first requires only unlawful entry into or remaining in a building.

As charged and proved here, however, they are the same both in law and fact. The only building the State alleged Bruce unlawfully entered was Reid's residence, a "dwelling." RCW 9A.52.025. Thus, the evidence proving the first degree burglary charge plainly sufficed to prove the residential burglary charge.

We can discern no clear legislative intent to impose multiple burglary convictions based on a single unlawful entry. Under the facts presented here, entry of convictions for both residential burglary and first degree burglary placed Bruce in double jeopardy.

We reverse and dismiss the residential burglary conviction. We affirm the trial court in all other respects.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Bjorgen, J.

We concur:

Johanson, C.J.

Sutton, J.