IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  39322-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATHAN ROBERT NASH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, A.C.J. — Nathan Nash appeals his convictions for third degree rape and second degree rape of two separate victims, T.P. and K.T., arguing he was unduly prejudiced by joinder of the two unrelated cases.  In addition, he argues the court abused its discretion by excluding specific instances of K.T.'s conduct that he claims demonstrated how K.T.'s mental illness affected her ability to perceive events.

We find no error and affirm.

BACKGROUND

In November 2019, Nash was charged with one count of second degree rape and one count of third degree rape of T.P. for an incident that occurred on or about October 23, 2019.  At the time of the alleged incident, Nash was on duty as a Spokane Police Department (SPD) officer.  While these charges were pending, another individual, K.T.,

came forward and reported that she had been sexually assaulted by Nash a few months

before the incident with T.P. The State filed charges alleging Nash committed second

degree rape and unlawful imprisonment against K.T. on or about July 6, 2019.

The State filed a pretrial motion for joinder and admission of ER 404(b) evidence.

After hearing argument by both parties, the court granted the State's motion for joinder

and entered written findings and conclusions. The motions relied on the affidavit of facts

prepared in both cases as summarized below.

*Incident with T.P.*

The State alleged that Nash responded to a domestic violence dispute between T.P.

and her ex-boyfriend on October 15, 2019. At the time, Nash told T.P. she could call

Crime Check and ask to speak with him. A few days later, bruises began to appear and

T.P. took photos of them. T.P. then attempted to contact Nash through the phone

numbers contained on the victim's information card so that she could find out where to

turn in the photos she took of her injuries. T.P. was unable to contact Nash, so she spoke

with her father who called the police front desk and asked for assistance.

On the date of the alleged incident, T.P. received a call from Nash from a phone

number labeled as "No Caller ID." T.P. informed Nash of her bruises, photographs, and

medical paperwork she received from the hospital, and he asked if there was a "private

place" they could meet to "go over" the bruises on her body. T.P. suggested they meet at

her apartment because she felt safe and was already there, although she attempted to push the meeting out after 11:00 a.m. so that her mother would be present.

Nash arrived at T.P.'s apartment around 10:45 a.m. in a marked SPD vehicle, wearing an SPD uniform equipped with a body camera. T.P. invited Nash into her apartment and led him back to her bedroom where she had a list of questions for him. T.P. began showing Nash the photographs of her bruises on her cell phone and pointed to the bruises still visible on her arms and neck. T.P. also had a bruise on her right hip, so she lowered her pants enough to show him the bruising. Nash asked if she had any other bruising "down there" and T.P. remembered a "fingerprint like" bruise on her lower hip/buttocks, so she lowered her pants a little more. Nash requested she take her pants "all the way down" and bend over the bed, to which she complied. Nash then asked "can you pull these down?" referring to her underwear. Clerk's Papers (CP) at 10. T.P. complied and Nash inserted his two fingers from his right hand into her vagina. As the assault continued, T.P. panicked and did not immediately respond. But after about 30 seconds, T.P. said, "Okay, that's enough," pulled up her pants, and said, "That's all the examining that needs to be done." CP at 10.

Nash did not have a camera with him and he did not take pictures of T.P.'s bruises or collect the photographs she had taken. While attempting to get Nash to leave, T.P. attempted to call her father but he did not answer. While leaving T.P.'s apartment, Nash provided her with his personal cell phone number.

3

Once Nash left, T.P. immediately called her best friend and disclosed what happened. Additionally, when T.P.'s mother called, T.P. told her what happened. After T.P.'s mother conveyed what happened to T.P.'s father, he went to the police department to file a complaint. T.P. went to Holy Family Hospital to have a rape kit performed.

Nash was interviewed by Detective Robert Satake following this incident. Nash admitted to calling T.P. about meeting at her apartment to examine potential evidence from her domestic violence call. Nash admitted leaving himself dispatched on a prior unrelated call and going to T.P.'s apartment without dispatching himself on a follow up call through any available means. Furthermore, Nash admitted he did not activate his body camera during this contact because of "privacy concerns" and the "sensitive nature of the issue." CP at 283. Nash also admitted that his fingers went into T.P.'s vagina but explained that this was because she placed his hand there.

A cursory review of the mobile client logs suggested Nash's New World system[1] had been closed or shut off at 10:39 a.m. and restarted at 11:15 a.m. During this time, Nash's location jumped from the SPD Cops NW shop and reappeared at Monroe and Wellesley where it remained for several minutes before resuming normal traffic speeds. Testing of several law enforcement laptops, including Nash's, did not reviewal any

---

[1] The New World Software Suite was described as several software applications including mobile computer aided dispatch (CAD), dispatch CAD, and law enforcement record management system (LERMS). The system includes GPS and AVL data.

system errors during that time. Additionally, an application on Nash's cell phone indicated that he was at T.P.'s apartment at the time of the alleged incident.

*Incident Involving K.T.*

Several months before the incident with T.P., on July 5, 2019, Nash, serving as an SPD patrol officer, responded to a call from K.T. reporting a physical altercation with her neighbor. Nash spoke to K.T. at her apartment and checked her face for injuries. Before leaving, Nash provided K.T. with a crime victim's card that included his phone number. Nash told her he would return the next day to take pictures.

The following day, K.T. received a call from Nash through a phone number that she did not recognize. Nash informed her that he was coming back to her apartment to take pictures of her injuries from the previous day and requested K.T. wear a dress. Nash eventually arrived at her home wearing his full SPD uniform. Nash informed K.T. that his other officers were "shut down" and had to "stay in one place." CP at 290. Later, K.T. learned there was an officer involved shooting that had occurred that day and she figured this is what Nash was referring to. During this time, Nash's New World program appeared to be closed.

Nash asked K.T. if he could take off his portable radio and she told him he could. However, K.T. could not recall whether Nash was wearing his body camera at the time. Nash and K.T. eventually moved over to the couch where he began to inspect her leg for injuries. At no point did K.T. see a camera nor did Nash attempt to take photos. Nash

5

pulled up her dress from her legs and began inserting his fingers into her underwear and touched her vagina. After this occurred, Nash pulled her dress over her head and pulled her underwear down. K.T. did not say anything because she was "afraid to fight" because Nash "had his uniform and gun on." CP at 291. Nash then raped K.T.

The following month, in August 2019, Nash returned to K.T.'s home. Nash and K.T. had been communicating for several weeks and she believed he was coming over to talk to her about the issues with her neighbor. Nash and K.T. ended up engaging in consensual intercourse. She explained that she noticed Nash had a tattoo that appeared to look like wings on his shoulder.

At first, K.T. did not tell anyone what had happened with her and Nash, but eventually she reported the incident in the summer of 2021. K.T. had called Crime Check regarding an anti-harassment order with her neighbor and subsequently provided information about Nash.

A forensic review of K.T.'s phone showed several phone calls and text messages back and forth with phone numbers associated with Nash in August and September 2019. The text messages culminated with a text from K.T. to Nash on September 25, 2019, that read:

> I was only really being nice to you because I know how really you are. How you treated me the day after I was beat up from my nebbor(sic) ty (Tyrus). Do you remember July 6 how you treated me? Then after I tried to be your friend so you wouldn't do that again to me again. Women shouldn't be treated like that you know. How would you like it if someone

treated your kids like that when they grow up?  What would you do if someone did that to your girl ?

CP at 307.  The message appears to reference the sexual assault on July 6.

*Trial*

After a full trial, the jury convicted Nash of third degree rape against T.P. and second degree rape against K.T., finding the aggravating circumstance that he used a position of trust to facilitate the commission of the crimes.  However, the jury acquitted Nash of second degree rape in count one and unlawful imprisonment in count four.

Nash appeals.

ANALYSIS

1.  JOINDER

In his first issue on appeal, Nash argues that the trial court abused its discretion by joining the two cases with more differences than similarities.  He contends he was unduly prejudiced by joinder of T.P. and K.T.'s cases.  We disagree.

As we noted above, the State initially charged Nash with the sexual assault of T.P. for an incident that occurred on October 23, 2019.  Almost two years later, and while the charges involving T.P. were still pending, K.T. came forward with allegations that Nash had assaulted her on July 6, 2019, three months before the assault on T.P.  After charging Nash with the assault on K.T., the State moved to join these charges with the pending charges involving T.P.

"A trial court's decision on a pretrial motion for joinder is reviewed for abuse of discretion." *State v. Martinez*, 2 Wn.3d 675, 681, 541 P.3d 970 (2024). A trial court abuses its discretion when its decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. Barry*, 184 Wn. App. 790, 802, 339 P.3d 200 (2014) (quoting *State v. Rice*, 48 Wn. App. 7, 11, 737 P.2d 726 (1987)). Joinder should not be allowed if it will "'clearly cause undue prejudice to the defendant.'" *Martinez*, 2 Wn.3d at 682 (quoting *State v. Bluford*, 188 Wn.2d 298, 307, 393 P.3d 1219 (2017)). "A reviewing court considers only the facts known [at the time] . . . when the joinder motion is argued, not facts later developed [during] trial." *Id*.

Under the rules of joinder, if multiple charges were originally brought against a defendant in separate charging documents, the court may join those offenses on a party's motion. *See* CrR 4.3(a). Joinder is liberally allowed where one of two circumstances exists: if the offenses "'(1) [a]re of the same or similar character, even if not part of a single scheme or plan; or (2) [a]re based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.'" *Bluford*, 188 Wn.2d at 310(quoting CrR 4.3(a)(1), (2)).

On the other hand, severance involves dividing joined offenses into separate charging documents. CrR 4.4(b). A court may grant severance where "the court determines that [it] will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). Generally, a party must move for severance

8

pretrial and if denied, "may renew the motion . . . before or at the close of all the evidence." CrR 4.4(a)(1), (2). Importantly, if the party does not timely make or renew their motion for severance, it is deemed waived. *Id*.

While Nash originally raised a pretrial motion for severance, he did not renew the motion before or at the close of all the evidence. Thus, the only issue before this court is whether the trial court properly granted the State's pretrial motion for joinder based on an abuse of discretion standard and the information before the court at the time of the motion to join the charges. On appeal, Nash contends that even if joinder was permissible under the rule, the trial court erred in determining that joinder would not cause him undue prejudice.

"After identifying whether joinder" is proper under CrR 4.3(a)(1), or (2), "the court should balance the likelihood of prejudice to the defendant against the benefits of joinder in light of the particular offenses and evidence at issue." *Bluford*, 188 Wn.2d at 310. While "judicial economy is relevant, . . . [it] cannot outweigh a defendant's right to a fair trial." *Id*. at 311 (emphasis omitted). Thus, "if joinder will cause clear, undue prejudice to the defendant's substantial rights, no amount of judicial economy can justify requiring a defendant to endure an unfair trial." *Id*. "However, where the likely prejudice . . . will not necessarily prevent a fair trial, the court must weigh prejudice to the defendant caused by the joinder against the obviously important considerations of

economy and expedition in judicial administration.'" *Id*. (internal quotation marks

omitted) (quoting *State v. Smith*, 74 Wn.2d 744, 755, 446 P.2d 571 (1968)).

"There are four factors to consider when determining whether joinder causes

undue prejudice: '(1) the strength of the State's evidence on each count; (2) the clarity of

defenses as to each count; (3) court instructions to the jury to consider each count

separately; and (4) the admissibility of evidence of the other charges even if not joined

for trial.'" *Id.* at 311-12 (internal quotation marks omitted) (quoting State v. Russell,

125 Wn.2d 24, 63, 882 P.2d 747 (1994)). In granting the State's motion for joinder, the

trial court considered each of the four factors.

A. *The strength of the State's evidence on each count*

In looking at evidentiary strength for purposes of a prejudice analysis under CrR

4.3, joinder may be prejudicial when the evidence on one count is "remarkably stronger"

than evidence on the other. *See State v. MacDonald*, 122 Wn. App. 804, 815, 95 P.3d

1248 (2004).

Here, the trial court found that both cases had "similar evidentiary strength." CP

at 643. In both matters, the evidence comprised of statements from the alleged victims as

well as circumstantial evidence of the New World computer system/data tracking

software. The court found that while the case against K.T. may have had additional

impeachment evidence and a different approach, this did not substantially change the

nature of the similar evidentiary strength.

10

Nash contends this decision was so outside the bounds of reasonableness as to constitute an abuse of discretion. In doing so, Nash claims the only similarities in this case were that Nash had previously interviewed both T.P. and K.T. regarding physical injuries. We disagree with this characterization of the trial court's findings. The trial court incorporated the State's table of similarities, which listed 13 similarities between the two cases. Nash does not assign error to any of the court's findings of fact, which are treated as "verities on appeal." *See In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). Regardless, the court's focus for purposes of this factor is on the strength of evidence for each charge, not necessarily the similarity of evidence for each charge.

Nash also contends that the evidence in the case with T.P. is stronger than the evidence in the case with K.T. Nash points out that there was DNA evidence in the charges with T.P. but not in the charges with K.T. He also points out that in T.P.'s case, there was corroborating evidence that Nash was at T.P.'s apartment at the time of the assault, but there is no corroborating evidence that Nash was in K.T.'s home on the day of the assault. And while the State contends that Nash turned off his body camera during contact with both victims, Nash asserts that there are different reasons for the lack of footage. Nash claims he turned his camera off at T.P.'s request while the lack of footage at K.T.'s home is because Nash was never at K.T.'s home.

The evidentiary differences pointed out by Nash do not undermine the court's determination that both cases had similar evidentiary strengths. In both matters, the

11

evidence was comprised of statements from the alleged victims, as well as corroborating circumstantial evidence that Nash logged out of the location tracking software and turned off his body camera during the time the victims alleged that he contacted them. The trial court acknowledged that there may have been additional impeachment evidence and a separate approach for K.T.'s case, but that did not substantially change the evidentiary strength of each charge. Moreover, the availability of DNA evidence was not known to the court at the time it decided the motion. Given the equivalent evidentiary strength, the court found factor one weighed in favor of joinder. The court did not abuse its discretion by making this finding.

### B. *The clarity of defenses for each count*

"The likelihood that joinder will cause a jury to be confused as to the accused's defenses is very small where the defense is identical on each charge." *State v. Russell*, 125 Wn.2d 24, 64, 822 P.2d 747 (1994). On the other hand, when defenses for multiple charges are complex or mutually antagonistic, severance may be required in order to avoid jury confusion that prejudices a defendant's right to a fair trial. *See State v. Nguyen*, 10 Wn. App. 2d 797, 819, 450 P.3d 630 (2019). For example, joinder may cause prejudice if "'a defendant makes a convincing showing that she has important testimony to give concerning one count and a strong need to refrain from testifying about another.'" *Id*. (quoting *State v. Watkins*, 53 Wn. App. 264, 270, 766 P.2d 484 (1989)).

12

Here, the court found that Nash's defense for the charges involving T.P. was

consent and the defense for the charges with K.T. was general denial or potential consent.

For T.P., the jury would need to consider whether Nash's claim that his hand was forced

to engage in sexual contact was consensual on T.P.'s part. As it relates to K.T., the jury

would have to consider whether any sexual contact occurred at all, and whether any

contact was consensual. Consent and general denial are simple concepts, easy for the

jury to understand, and not likely to cause confusion.

Nash does not challenge these findings on appeal. Instead, he argues that the

defenses for each count were not similar and he was prejudiced by having to attack the

credibility of two unstable women instead of one. While we agree that a jury is less

likely to believe that two women accusing Nash of similar misconduct are unstable, this

is not the type of prejudice a court considers when deciding a motion for joinder. At the

time of the motion for joinder, Nash did not demonstrate that his defenses were complex

or antagonistic, or that he anticipated testifying in one case but not the other.

*C. The court's instructions to the jury to consider each count separately*

The trial court properly considered that the jury instructions would include WPIC

3.01,[2] which instructs the jury that a separate crime is charged for each offense and they

---

[2] *11 Washington Practice: Washington Pattern Jury Instructions: Criminal 3.01*, at 92 (5th ed. 2021) (WPIC).

13

must decide each separately. Additionally, the court acknowledged that commentary to WPIC 3.01 allows for the parties to tailor that instruction to the facts of the case.

Nash argues that while the trial court properly instructed the jury that it must consider each count separately, and that the verdict on one count should not control the verdict on another, the court never gave a limiting instruction that the evidence of one crime could not be used to decide guilt for another crime. However, our review is limited to whether the trial court abused its discretion when it granted the motion for joinder, which occurred pretrial. Thus, this argument fails. And, even if it were to be considered, Nash acknowledged that the court was not required to give an instruction sua sponte and that the absence of such an instruction was not error.

### D. *The cross-admissibility of evidence*

In analyzing the fourth factor a court must determine the admissibility of evidence of the other charges if not joined for trial. Put another way, the court determines whether evidence of the charges would be cross admissible under ER 404(b). ER 404(b) permits evidence of other crimes to show identity, motive, intent, preparation, plan, knowledge, absence of mistake or accident, opportunity, or an alternative means by which the crime could have been committed. Such evidence is normally not admissible to "prove the character of a person in order to show action in conformity therewith." ER 404(b).

As part of the ER 404(b) analysis, the court considers four factors, which include that the prior misconduct must be: "'(1) proved by a preponderance of the evidence, (2)

14

admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial.'" *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003) (quoting *State v. Lough*, 125 Wn.2d 847, 852, 889 P.2d 487 (1995)).

Here, the court found that these factors were met and the evidence of the assault on K.T. would be admissible in the case involving T.P. even if the charges were not joined. Specifically, the court found that it was more probable than not that the offense against K.T. occurred. The court found that the alleged assault on K.T. as well as the circumstantial evidence including that Nash turned off his location tracker during the alleged contact was evidence of Nash's intent, modus operandi, preparation, plan, and knowledge and was not being introduced to show propensity. Finally, the court found that there were significant similarities between the two offenses and the probative value of the alleged assault on K.T. outweighed any danger of unfair prejudice. Based on these similarities, the court determined that evidence of each case was cross-admissible under ER 404(b).

On appeal, Nash fails to challenge the trial court's findings or refute its conclusions on the cross-admissibility of the two charges. Instead, Nash points to evidence produced at trial to challenge the conclusion that the assaults were cross-admissible as evidence of a common scheme or plan. He fails to demonstrate that the

evidence produced at trial was available to the trial court at the time of the State's motion for joinder.

In his reply brief, Nash contends for the first time that the State's theory of a common scheme or plan does not establish the signature-like similarity required to show identity.[3] He claims that courts consider whether the similarities between the two crimes are unusual or distinctive. This argument fails to recognize that identity is just one of the many ER 404(b) exceptions. In fact, the trial court found, and Nash does not challenge, that the alleged assault on K.T., as well as the circumstantial evidence such as the New World computer information, went toward his intent, modus operandi, preparation, plan, and knowledge. Thus, proving the uniqueness of identity alone is not a determinative factor under the ER 404(b) analysis.

### E. Balancing prejudice versus judicial economy

Beyond the four factors set forth above, Nash contends that the trial court failed to balance the prejudice inherent in joining sex crimes against the judicial economy gained from joining the charges. *See Bluford*, 188 Wn.2d at 315. He asserts that the trial court did not articulate the benefits of judicial economy and maintains that there was only one mutual witness.

---

[3] *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

We find this argument unconvincing.  At the hearing on the motion for joinder, defense counsel focused on the prejudice side of the balancing test, arguing that "judicial economy never trumps any prejudice to the defendant."  Rep. of Proc. (Aug. 16, 2021) (RP) at 163.  Moreover, the trial court was cognizant of the potential for prejudice and carefully considered the evidence of assault against K.T.

Ultimately, Nash fails to demonstrate that the trial court abused its discretion in joining the two charges for purposes of trial.

2.  PRECLUSION OF SPECIFIC ACTS BY K.T. AS EVIDENCE OF MENTAL ILLNESS

*A.  Additional Relevant Facts*

In December 2021, Nash moved for an order releasing K.T.'s mental health records from a treatment provider to determine whether he should be able to review the records as part of his defense.  Specifically, defense sought to show that K.T. suffered from mental health issues that may impact her ability to perceive events and/or remember them.  Nash contends that in numerous instances during her interviews with the authorities, K.T. referenced her learning disabilities and PTSD/flashbacks/trauma, which she attributed to an assault by her neighbor.  Nash contends that throughout these contacts with authorities, which appeared to be over 100, K.T. was referred to mental health professionals.  As a result, the court found good cause for Frontier Behavioral Health (FBH) to release K.T.'s mental health records.

During motions in limine, the State sought to exclude evidence of prior bad acts of its witnesses. Nash opposed this motion. Specifically, defense stated that in 2019 when K.T. called in to report an issue with her neighbor, which was her first contact with Nash, it was not her first call to law enforcement. Defense argued that her neighbor always denied the allegations K.T. made against him. And whether K.T. suffered from hallucinations or delusions, which are referenced in the FBH records, corresponds, at least in part, to the time frame with Nash. For this reason, defense argued what happened with her neighbor and whether it happened or not was relevant to this case.

In response, the State moved to exclude evidence regarding the details of the alleged prior assault by her neighbor. The State argued that any allegation that K.T. initiated that contact, was the initial aggressor, or that she assaulted him were not relevant. Further, the July 5 date was only relevant to the extent that it was when Nash and K.T. met, but it was not when the rape occurred. Instead, the rape occurred the following day on July 6 and her neighbor was not present that day. In addition to relevance, the State argued this may turn into a "mini trial" about the incident with her neighbor, a collateral issue, which would be confusing to the jury.

Defense clarified that it was not seeking to get into the details of all the prior calls in relation to her neighbor. Instead, defense stated "it's not my intent to go through the number of calls that [K.T.] had made to the various police agencies or the details of those calls, although this, again, on July 5, I think the details are relevant from the context of

are they consistent with what the officers observed." RP (July 28, 2022) at 15. In the context of her hallucinations and delusions, which were documented during this time period, defense claimed that the calls were relevant to K.T.'s perceptions that the rape occurred. Based on this information, the defense argued that the calls would be relevant in general terms as they related to her history of contact compared to what was alleged and what was observed by the police officers.

After hearing argument by the parties, the court granted the State's motion to exclude evidence of K.T.'s claims against her neighbor:

> My concern with the introduction of evidence between any type of conflict between [K.T.] and [her neighbor] is it does create some problem with relevance. I think it's really under 403 where the jury is going to be left trying to decide did she—was she assaulted by [her neighbor]? Was she making false allegations against [her neighbor]? It's going to end up being a trial on that issue rather than a trial having to do what's being alleged in the Information. It sounds like perhaps what she claims to law enforcement occurred between she and [her neighbor] might not be supported by any type of physical evidence, but then there's an allegation, I haven't checked into it, that there was an anti-harassment order issued at a later time, which requires a course of conduct that, I guess, could date back to July of 2019. So then the State would probably seek to introduce some evidence showing that there was at least a finding by a preponderance of the evidence some of these acts had occurred. So, again, we're just confusing the issues.

RP (July 28, 2022) at 19.

Nevertheless, the court granted Nash's motion to admit evidence of K.T.'s mental health diagnosis and symptoms. It explained there was at least some evidence that K.T. may have been suffering from schizoaffective disorder at the time the event with Nash

occurred.  If she was suffering from the effects of the disorder, it would have a bearing on her credibility.  Therefore, the court allowed the defense to inquire into that condition because she may or may not have been suffering from symptoms on the day she met Nash.  It noted there may be medical documentation to show that perhaps she was and that expert testimony could lay out exactly how that would reveal itself.

In response to the State's request for clarification, the court concluded that Nash would be able to introduce evidence of K.T.'s mental health and symptoms around the time of the alleged assault and again around the time that she reported the incident several months later, noting:

> This is going to get complicated once again because we have about a two year time span, it looks like that being July of 2019 to July of 2021, when the report was made.  Again, the issue at trial isn't [K.T.'s] mental health condition.  Her condition is relevant to show whether or not she's possibly fabricating this allegation or she's not correctly remembering this allegation, meaning that she was suffering from some type of hallucination or delusion or something to that effect.  So her mental health condition on or about July 5 of 2019 is relevant as already discussed.  But between July of 2019 and July of 2021, her mental health condition is not relevant.
>
> . . .
>
> However, what was occurring in July of 2021 is also relevant because if she does have this psychological problem that could cause some delusions, maybe that's a basis for what was reported in 2021.  So her mental health records or her psychological condition is relevant only for those two time periods.

RP (July 28, 2022) at 27.  The hearing concluded with defense counsel acknowledging it had not yet been able to speak with treatment providers directly.

20

During a break in the trial, defense counsel stated that they had talked to the witnesses from FBH who did not want to be interviewed before testifying.  The parties agreed that the solution would be to put the witnesses on the stand and essentially interview the witnesses outside the presence of the jury.  The parties agreed to a hearing outside the presence of the jury to conduct their interviews mid-trial.

Later that day, outside the presence of the jury, Dr. David Potter, a psychiatrist who had treated K.T., was called as a witness by the defense.  Dr. Potter indicated that he began treating K.T. in October 2020, and had diagnosed her with schizoaffective disorder, bipolar type.  Dr. Potter explained that schizoaffective disorder is a condition where a person has mood symptoms of mania and/or depression with psychotic symptoms that last at least two weeks, which include delusions and/or hallucinations.  Dr. Potter treated K.T. about four times.

During this questioning, Dr. Potter referenced a report from March 23, 2019, which stated "[p]atient reports she is Jesus and states she had not been prescribed medications."  RP (Aug. 24, 2022) at 1240.  Dr. Potter admitted he was not the one who engaged in this specific phone call with K.T.  The State asked whether it was possible K.T. could have been sarcastic to which Dr. Potter responded "I don't know.  I guess you would have to ask her about that.  I'm not quite sure, you know, what she was thinking when she said what she said."  RP (Aug. 24, 2022) at 1242.  Defense counsel confirmed Dr. Potter was the lead psychiatrist and asked "[a]nd there was nothing in the note that

21

suggested that what she was communicating had anything based in sarcasm?"  RP (Aug. 24, 2022) at 1243.  Dr. Potter responded, "not that I'm aware of, no."  RP (Aug. 24, 2022) at 1243.

After the interviews, the attorneys argued their respective positions to the court. Defense counsel asked that K.T.'s diagnosis be admitted into evidence along with specific instances reflecting on that diagnosis including the "Jesus" remark.  The State objected, noting that it was not clear whether the comment was sincere or sarcastic. Ultimately, the court allowed defense counsel to admit evidence of K.T.'s diagnosis and symptoms, but excluded specific instances of manifestation, including the "Jesus" comment:

> As far as Dr. Potter is concerned, generally a witness's mental health diagnosis wouldn't be admitted because it is really not relevant if she has PTSD, OCD, anxiety or depression.  Here it's because of the schizoaffective disorder that the Court has allowed.  The way that that could manifest itself is to hallucinations and delusions.  And if there were hallucinations or delusions that impacted what she perceived was occurring, the jury should know about that.

> So the court will allow Dr. Potter to testify about her diagnosis, when she was diagnosed, what she was diagnosed with and how those diagnoses, or the symptoms of those diagnoses and what may be used to treat those diagnoses.  As far as the specifics of her manifesting those diagnosis, the Court's going to exclude that.  I think, as can be seen in that telephone call, there really isn't any way to know whether she was just being sarcastic in the phone call or whether or not she really thought that she was Jesus and she was in the future.  And then it becomes a secondary issue, which, again, would confuse the issues.  Perhaps the State would bring her back in on rebuttal and start asking her questions about that particular incident.

Also, as far as her neighbor goes, she was continually talking about her neighbor during her testimony. Dr. Potter seemed to think that she had delusions about her neighbor causing her harm or something to that effect. I understand there's a third-degree assault charge. I didn't look it up. I don't know what happened to that. I also understand she had at least a temporary anti-harassment order, and if the Court were to allow the portion about her neighbor to come in, then once again, we're going to confuse the issue and this trial is going to turn into whether or not her neighbor really was causing her problems or harming her or whether or not she was just having delusions of that.

RP (Aug. 24, 2022) at 1259-60.

*B. Analysis*

Nash contends the trial court abused its discretion in barring defense counsel from eliciting specific instances where K.T. expressed delusional thinking due to her mental illness, specifically K.T.'s complaint against her neighbor and her claim of being Jesus.

This court reviews "decisions to admit evidence using an abuse of discretion standard." *State v. Quaale*, 182 Wn.2d 191, 196, 340 P.3d 213 (2014). The proponent of evidence has the burden of establishing that the evidence is relevant. *State v. Pacheco*, 107 Wn.2d 59, 67, 726 P.2d 981 (1986). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Under ER 403, "[a]lthough relevant, evidence may [still] be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion

of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The trial court did not abuse its discretion by granting the State's motion to exclude evidence of a conflict between K.T. and her neighbor.  Evidence of the conflict with the neighbor was relevant only if Nash could show that K.T.'s allegations were untrue *and* a byproduct of her mental illness.

The trial court recognized this when it voiced its concern that under ER 403, the jury may be left trying to decide whether K.T. was assaulted by her neighbor or not.  The real issue was how K.T. and Nash came into contact, which first occurred on July 5, 2019, in response to a contact with law enforcement regarding her neighbor.

Nevertheless, Nash contends there was evidence tending to show that K.T.'s allegations against her neighbor were false.  Nash points out that the allegations against the neighbor occurred during the same time frame as Nash's assault on K.T., the neighbor denied the allegations, and police did not charge the neighbor with a crime.  The trial court did not abuse its discretion in deciding that this information was insufficient to show that K.T.'s allegations against her neighbor were false and due to her mental illness.

In addition to the failure to show relevance, Nash fails to show any prejudice from excluding evidence of K.T.'s conflict with her neighbor.  The trial court still allowed a psychiatrist to testify that K.T. was diagnosed with schizoaffective disorder bipolar type. Further, the psychiatrist testified this can cause hallucinations and delusional behavior.

From this information, Nash argued in closing that K.T.'s mental health impacted her ability to accurately perceive and recall events and the jury should not find her credible.

For the same reasons, the trial court did not abuse its discretion by excluding evidence that in March 2019 K.T. made a comment that she thought she was Jesus. The comment is only relevant if it demonstrated a firmly held belief based on K.T.'s mental illness on or near the time of the incident or the allegation. But the person to whom the comment was made did not testify, and the doctor reading the notes had no way of knowing whether the comment was made in sincerity or sarcasm. Furthermore, the comment was made nearly four months before K.T.'s encounter with Nash. As previously mentioned, the jury heard K.T.'s diagnosis and that it could manifest in delusions and hallucinations.

We find no abuse of discretion and affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____           _____
Lawrence-Berrey, C.J.                                      Pennell, J.